**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW YORK IMMIGRATION COALITION, MAKE THE ROAD NEW YORK, CASA, AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE, ADC RESEARCH INSTITUTE, FIEL HOUSTON INC. | Civil Action No. |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, | |
| UNITED STATES DEPARTMENT OF COMMERCE; | |
| WILBUR L. ROSS, JR., in his official capacity as Secretary of Commerce, | |
| BUREAU OF THE CENSUS, an agency within the United States Department of Commerce; and | |
| STEVEN DILLINGHAM, in his official capacity as Director of the U.S. Census Bureau, | |
| Defendants. | |

## COMPLAINT

1.   This action challenges President Trump's lawless attempt to exclude undocumented immigrants from the "persons" who must be counted in the Census for purposes of apportioning congressional seats to states.  This xenophobic effort to deny the basic humanity of undocumented immigrants violates Article I's mandate to count all "persons" in the Census, and the Fourteenth Amendment's requirement that

"Representatives shall be apportioned among the several States according to their respective numbers, counting the *whole number of persons* in each State . . . ." (emphasis added). These words leave no room for doubt: they expressly mandate counting "the whole number of persons" living in the United States for purposes of congressional apportionment. As the Supreme Court held just four years ago, "the Fourteenth Amendment calls for the apportionment of congressional districts based on total population," including all non-citizens living in the United States, regardless of legal status. *Evenwel v. Abbott*, 136 S. Ct. 1120, 1129 (2016).

2. Despite this exceedingly clear constitutional command and binding Supreme Court precedent, on July 21, 2020, Defendant Trump issued a Presidential Memorandum addressed to Defendant Commerce Secretary Wilbur Ross titled, "Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census" (the "Memorandum"). The Memorandum purports to declare—for the first time in our nation's history—that it is "the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act, as amended (8 U.S.C. 1101 et seq.)." In other words, the Memorandum directs Secretary Ross: do not count undocumented immigrants at all for purposes of congressional apportionment.[1]

---

[1] The Memorandum appears to potentially exclude both those with no form of status whatsoever as well as those currently authorized to remain and work in the U.S., such as holders of Deferred Action for Childhood Arrivals, who are nonetheless not "in lawful status under the Immigration and Nationality Act." See *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 487 (9th Cir. 2018) ("recipients of deferred action enjoy no formal immigration status") (quotations omitted), *rev'd in part, vacated in part sub nom Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 412

3.    Rarely does any government actor, much less the President of the United States, so openly and obviously violate the Constitution.  The Fourteenth Amendment mandates "counting the whole number of persons" for congressional apportionment.  As the Supreme Court reaffirmed nearly four decades ago, an undocumented individual living in the United States "is surely 'a person' in any ordinary sense of that term," "[w]hatever his status under the immigration laws."  *Plyler v. Doe*, 457 U.S. 202, 210 (1982).  The President cannot change the fact that undocumented individuals are human beings.

4.    The new "policy" also breaks an uninterrupted line of history: every Decennial Census in our nation's history has included every person who lives in the United States, regardless of citizenship or immigration status, for purposes of apportioning congressional representation.  Defendant Trump's new policy set forth in the Memorandum therefore not only violates the plain and unequivocal text of Section 2 of the Fourteenth Amendment and related Supreme Court precedent, it also departs from hundreds of years of consistent Census practice.

5.    In addition to contravening the plain text of the Constitution, Supreme Court precedent, and an unbroken line of historical practice, the policy conflicts with the Department of Justice's own longstanding position—asserted repeatedly over decades in litigation in courts around this country, including to this Court in 2018—that undocumented immigrants are "persons" who must be counted in the Decennial Census

───────────────

(E.D.N.Y. 2018) ("Deferred action does not . . . confer lawful immigration status"), *vacated and remanded sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020). For the sake of consistency, Plaintiffs refer to all those excluded here as "undocumented."

and apportionment calculations.  The Administration's own lawyers have made clear that the policy is unconstitutional.

6.  The new policy is a discriminatory attack on immigrants and immigrant communities, and particularly immigrant communities of color.  It is intended to erase these individuals and communities, and to send the message that they do not count. Indeed, whereas the original Apportionment Clause in Article I, Section 2 infamously discounted enslaved Black Americans as three-fifths of a person for purposes of congressional apportionment, the Memorandum raises this numerical dehumanization to a new level: not three-fifths, but zero.

7.  In practical terms, the policy will result in states such as California, Texas, and New York receiving fewer congressional districts and Electoral College votes, diluting the political power of the residents of these states.  The policy will also deplete federal resources from states and localities with substantial immigrant populations.  The policy is rank discrimination on the basis of national origin, race, and ethnicity in violation of the Equal Protection and Due Process guarantees of the Fifth Amendment.

8.  The effects of the new policy will cascade beyond the exclusion of undocumented immigrants from the Census count.  It is no coincidence that the Memorandum was unveiled shortly before the Census Bureau was scheduled to commence non-response follow up ("NRFU") field operations to identify persons who have not yet responded to the Census.  The new policy of excluding undocumented immigrants from the Census conveys a xenophobic message aimed at suppressing Census participation from households containing immigrants and noncitizens.  Unless enjoined, the policy undoubtedly will undermine the effectiveness of the Census Bureau's

4

operations and deter members of immigrant communities—including undocumented immigrants, noncitizen immigrants with legal status, and United States citizens—from participating in the Census.

9.   The new policy also violates a panoply of other constitutional and statutory prohibitions, including constitutional separation of powers, the Census Act, and the Administrative Procedure Act.

10. This is not Defendant Trump's first attempt to weaponize the Census to attack immigrant communities.  Last year, the Supreme Court affirmed that the administration's effort to add a citizenship question to the 2020 Decennial Census would reduce Census responses among non-citizen households, and held that Defendant Ross's publicly-stated rationale—purportedly to help enforce the Voting Rights Act—was "contrived." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565-66, 2575 (2019).

11. In issuing the Memorandum, Defendant Trump has now confessed the real reason behind that failed effort: to delete undocumented immigrants from the decennial enumeration altogether, and to exclude them categorically from the very concept of *personhood* in the Constitution.  Among its many cynical motivations, the President's new policy is an obvious attempt to evade the consequences of the Supreme Court's decision and the permanent injunction issued by the district court in the citizenship question litigation.  *See Dep't of Commerce*, 139 S. Ct. 2551; Order, *New York v. Dep't of Commerce*, No. 18-CV-2921, ECF No. 634 (S.D.N.Y. July 16, 2019).

12. Plaintiffs therefore request declaratory, injunctive, and/or mandamus relief to prohibit Defendants from excluding undocumented immigrants from the population count used to apportion the House of Representatives.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1346(a), and 28 U.S.C. § 1361.

14. Venue is proper in this judicial district under 28 U.S.C. § 1391(e).

15. This Court has the authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

## PARTIES

### A.  Plaintiffs

#### 1.  *The New York Immigration Coalition*

16. The New York Immigration Coalition ("NYIC") is an umbrella policy and advocacy organization for more than 200 groups in New York State, representing the collective interests of New York's diverse immigrant communities and organizations.  It has its principal place of business at 131 West 33rd St, New York, NY 10001.

17. NYIC's mission is to unite immigrants, members, and allies so that all New Yorkers can thrive.  It envisions a New York State that is stronger because all people are welcome, treated fairly, and given the chance to pursue their dreams.  NYIC pursues solutions to advance the interests of New York's diverse immigrant communities and advocates for laws, policies, and programs that lead to justice and opportunity for all immigrant groups.  It seeks to build the power of immigrants and the organizations that serve them to ensure their sustainability, improve people's lives, and strengthen New York State.

18. NYIC's 200-plus members are dues-paying, 501(c)(3), nonprofit organizations that are committed to advancing work on immigrant justice, empowerment,

and integration.  NYIC's members are located throughout New York State and beyond. These member groups include grassroots community groups, social services providers, large-scale labor and academic institutions, and organizations working in economic, social, and racial justice.  A number of NYIC's member organizations receive funding from a variety of local, state, and federal government sources to carry out social service, health, and education programs.  Many of these organizations receive governmental funding that is directly tied to the Decennial Census.

19. New York is likely to lose at least one House seat during the post-2020 Decennial Census apportionment process as a result of the exclusion of undocumented immigrants from the apportionment base.  NYIC member organizations will lose political power because of New York's loss of at least one seat in the House of Representatives.

20. The exclusion of undocumented immigrants from the Census base count will very likely reduce the amount of federal funds that are distributed to the states and localities where Latinos, Asian-Americans, Arab-Americans, and other immigrant communities of color constitute significant portions of the population.  This will injure a number of NYIC's member organizations that receive funding to carry out social service, health, and education programs in these areas.

21. As an organization, NYIC has an ongoing commitment to promoting engagement in the Decennial Census among individuals served by its member organizations.  For the 2020 Decennial Census, NYIC has and will continue to invest resources in Get Out the Count efforts through robust advocacy, outreach, and mass educational forums.

22. The Census is ongoing, with the Census Bureau's NRFU just getting started.[2] NYIC plans to continue its Get Out the Count efforts during this NRFU.  In its extensive Decennial Census outreach, NYIC will now face a much more difficult environment due to the perception among New York undocumented immigrants that they no longer need to complete the Census now that undocumented immigrants are being excluded from the apportionment, as well as immigrant communities' heightened fear of interacting with government workers that this new policy will cause.  This fear extends not only to undocumented immigrants, but also to family and household members of undocumented immigrants who will be concerned that participating might endanger their loved ones.

23. Because of the heightened fear and suspicion created by the decision to exclude undocumented immigrants from the apportionment count, as well as confusion among undocumented communities about whether they need to or should fill out the Census in light of the Memorandum, NYIC will be forced to expend additional resources on their outreach efforts to try to reduce the negative impact of the Memorandum on the response rate in the immigrant communities they serve, particularly to undocumented immigrant communities.  Staff time and other resources devoted to NYIC's Get Out the Count efforts will be diverted to communications to combat fear and disinformation resulting from the Memorandum.  Moreover, NYIC has already, and will continue to, divert resources from its other organizational priorities, including its work on health care

---

[2] U.S. Census Bureau, *2020 Census: Nonresponse Followup*, https://www.census.gov/newsroom/press-kits/2020/nonresponse-followup.html (June 19, 2020).

and language access issues, to address these concerns about decreased Census participation.

### 2.   *Make the Road New York*

24. Plaintiff Make the Road New York ("Make the Road New York") is a nonprofit membership organization with offices and service centers in Brooklyn, Queens, Staten Island, Suffolk County, and White Plains.

25. Make the Road New York's mission is to build the power of immigrant and working-class communities to achieve dignity and justice.  To achieve this mission, they engage in four core strategies: Legal and Survival Services, Transformative Education, Community Organizing and Policy Innovation.

26. Make the Road New York has more than 22,000 members who reside in New York City, Long Island and Westchester County.  These members lead multiple organizing committees across numerous issues and program areas of concern to the organization.  Members take on leadership roles in the campaigns, determine priorities, and elect the representatives who comprise most of the Board of Directors.

27. The apportionment resulting from the exclusion of undocumented immigrants from the apportionment base will likely deprive New York of at least one seat in the House of Representatives, diminishing the political and voting power and influence, and thus injuring, Make the Road members who live in New York.

28. The exclusion of undocumented immigrants from the Census base count will very likely reduce the amount of federal funds that are distributed to states and localities where Latinos, Asian-Americans, Arab-Americans, and other immigrant communities of color constitute significant portions of the population.

29. Make the Road New York members include individuals who do not have lawful immigration status and as a result of the Memorandum will not be counted for apportionment of Congressional seats.  Make the Road New York members also reside in states and localities where immigrant communities of color constitute significant portions of the population, including New York City and suburban areas outside of New York City.  Its members in these jurisdictions rely on a number of government services whose funding is allocated based on population and demographics determined by the Decennial Census.  This includes parents with children enrolled in Title I schools, and drivers who use the roads on a daily basis and thus depend on federal highway funds to perform their jobs.

30. Make the Road New York members will be deprived of funding to which they would be entitled by a more complete Census count.

31. One of the many Make the Road members who will suffer injury due to the exclusion of undocumented immigrants from the apportionment base is Perla Liberato. Ms. Liberato is a resident of Queens County, NY, where she works as a Youth Organizer. Because Ms. Liberato resides in New York State, she will lose political power because of her state's loss of representation in Congress.

32. Another Make the Road member who will suffer injury due to the exclusion of undocumented immigrants from the apportionment base is Yatziri Tovar. Ms. Tovar is a resident of Bronx County, NY, and works as a media specialist.  Because Ms. Tovar resides in New York State, she will lose political power because of her state's loss of representation in Congress.

33. Make the Road New York has an ongoing commitment to promoting engagement in the Decennial Census among its members and constituents.  For the 2020 Decennial Census, Make the Road New York is engaged in outreach and education work and receiving outside funding to help support this work.  This work includes, among other things, general education programs, workshops for members, and person-to-person outreach.  Make the Road New York's Census outreach efforts have already contacted over 100,000 people and assisted over 7,500 people with completing the Census questionnaire.

34. Make the Road New York will now face a much more difficult environment due to its constituents' heightened fear of interacting with government workers, which will be increased by anti-immigrant actions such as the decision to exclude undocumented immigrants from the apportionment base.  This fear extends not only to undocumented immigrants, but also to family and household members of undocumented immigrants, who will be concerned that participating in the Decennial Census might endanger their loved ones.

35. Because of the heightened fear and suspicion created by the decision to exclude undocumented immigrants from the apportionment base, as well as confusion among undocumented communities about whether they need to or should fill out the Census in light of the Memorandum, Make the Road New York will be forced to expend more resources on their Decennial Census outreach efforts to reduce the effect of this policy change on the response rate in the immigrant communities of color it serves.

36. Because of the need to increase the time and money spent on Decennial Census outreach due to the fear and confusion generated by the Administration's decision

to exclude undocumented immigrants from the apportionment base, Make the Road New York will need to divert resources from other areas critical to its mission including civic engagement and providing legal services.

### 3. CASA

37. Plaintiff CASA is a nonprofit membership organization headquartered in Langley Park, Maryland.  It has offices in Maryland, Virginia and Pennsylvania.  CASA is the largest membership-based immigrants' rights organization in the mid-Atlantic region, with more than 90,000 members.

38. CASA's mission is to create a more just society by increasing the power of and improving the quality of life in low-income immigrant communities.  To advance this mission, CASA offers social, health, job training, employment, and legal services to immigrant communities.  CASA serves nearly 20,000 people a year through its offices and provides support to additional clients over the phone and through email.

39. CASA as an organization receives governmental funding that is directly tied to the Decennial Census.  Among other things, CASA receives Community Development Block Grant (CDBG) funds that are allocated based on population and demographics determined by the Decennial Census, including poverty levels.  The exclusion of undocumented immigrants in the Census base count will very likely result in a lower percentage of CDBG funds allocated to the areas that CASA serves, and therefore CASA will receive fewer such funds.

40. CASA has an ongoing commitment to promote participation in the Decennial Census among its members and constituents.  For the 2020 Decennial Census, CASA is participating in ongoing outreach and education work.

41. CASA plans to continue its Get Out the Count efforts during the NRFU.  But CASA's efforts will be undermined by the decision to exclude undocumented immigrants from the congressional apportionment because this will decrease participation among undocumented immigrants who will believe that they no longer need to complete the Census, and it will heighten fear of interacting with government workers among immigrant communities of color.  This fear extends not only to undocumented immigrants but also to family members of undocumented immigrants, who will be concerned that participating in the Decennial Census might endanger their loved ones.

42. Because of the difficulties created by the decision to exclude undocumented immigrants from the Census count base, CASA will be forced to expend more resources on its Decennial Census outreach efforts to reduce the effect of this change in policy on the response rates in the immigrant communities of color it serves.

43. Because of the need to increase the time and money spent on Decennial Census outreach due to the decision to exclude undocumented immigrants from the Census count base, CASA will need to divert resources from other areas critical to its mission, including job training and health outreach.

### 4.   The American-Arab Anti-Discrimination Committee

44. Plaintiff American-Arab Anti-Discrimination Committee ("ADC") is a civil rights organization committed to defending and promoting the rights and liberties of Arab-Americans and other persons of Arab heritage.  ADC is the largest American-Arab grassroots civil rights organization in the United States.

45. Founded in 1980 by former Senator James Abourezk, ADC's objectives include combating stereotypes and discrimination against and affecting the Arab-

American community in the United States, serving as a public voice for the Arab-American community in the United States on domestic and foreign policy issues, and educating the American public in order to promote greater understanding of Arab history and culture.  ADC advocates, educates, and organizes to defend and promote human rights and civil liberties of Arab-Americans and other persons of Arab heritage.

46. ADC has several thousand dues-paying members nationwide, with members in all 50 states including California, New York, and Texas.  Its members are also active through ADC's 28 local chapters and organizing committees, located in 20 states and the District of Columbia, including in Tucson and Phoenix, Arizona; Los Angeles and Orange County, California; Miami and Orlando, Florida; New York, New York; and Austin and Dallas, Texas.

47. ADC has members in states with significant populations of undocumented immigrants, such as Texas, New York, Florida, California, Arizona and Illinois.  These states—particularly Arizona, California, New York, and Texas—are likely to lose at least one House seat (or not gain at least one House seat they would have gained) during the post-2020 Decennial Census apportionment process, as a result of the exclusion of undocumented immigrants from the apportionment base.  Many but not all of ADC's members in these states are U.S. citizens.  The loss of political representation and political power will injure ADC's members in these states.

48. The exclusion of undocumented immigrants in the Census base count will reduce the amount of federal funds that are distributed to the states and localities where Latinos, Asian Americans, Arab Americans, and other immigrant communities of color constitute significant portions of the population.  This will injure ADC members who

14

reside in these areas, such as San Antonio and Houston, Texas and Miami-Dade, Broward, and Orange Counties, Florida, Kings County, New York, and Prince George's County, Maryland.  For example, ADC has members in these jurisdictions with children enrolled in Title I schools and members who use the roads on a regular basis and thus depend in part on federal highway funds for their upkeep.

49. As an organization, ADC is committed to promoting participation in the Decennial Census among its members and constituents.  For the 2020 Decennial Census, ADC has undertaken engagement work within the Arab-American community.  For example, ADC is conducting training for Census enumerators, running advertisements encouraging participation, and holding a strategy symposium, among other activities. ADC plans to continue its Get Out the Count work through the Non-Response Follow-Up time period.

50. ADC faces a difficult environment due to increased fear of interacting with government workers among the Arab-American community, a fear that will be heightened now because of the decision to exclude undocumented immigrants from the apportionment.  This fear extends not only to undocumented immigrants, but also to family and household members of undocumented immigrants, who fear that participating in the Decennial Census might endanger their loved ones.

51. Because of the heightened fear and suspicion created by the decision to exclude undocumented immigrants from the apportionment base, ADC will be forced to invest more resources in its Decennial Census outreach efforts to reduce the effect of this policy change on the response rates in the communities it serves.

52. Because of the need to increase the time and money spent on Decennial Census outreach caused by the decision to exclude undocumented immigrants from the apportionment base, ADC will need to divert resources from other areas critical to its mission, including organizing, issue advocacy efforts, and educational initiatives.

### 5.  *The ADC Research Institute*

53. Plaintiff ADC Research Institute ("ADCRI") is a 501(c)(3) corporation founded in 1982 by former Senator James Abourezk.  ADCRI sponsors public programs and initiatives in support of the constitutional and First Amendment rights of Arab-Americans, as well as research studies, publications, seminars, and conferences that document discrimination faced by Arab-Americans in the workplace, schools, media and government agencies.  These programs also promote a better understanding of Arab cultural heritage by the public and policy makers.

54. ADCRI is currently engaged in promoting Decennial Census participation among its constituents.  ADCRI plans to continue this work through NRFU time period.

55. ADCRI is now facing a much more difficult environment due to increased fear in the Arab-American community of interacting with government workers, due in part to anti-immigrant actions such as the exclusion of undocumented immigrants from the apportionment base.  Because of this heightened fear and suspicion, ADCRI will be forced to invest more resources in its outreach efforts to reduce the effect of this policy change on the response rates in the communities it serves.

56. Because of the need to increase the time and money spent on Decennial Census outreach due to the decision to exclude undocumented immigrants from the apportionment base, ADCRI will need to divert resources from other areas critical to its

mission, including its engagement with public school teachers and other educational issues

### 6. *FIEL Houton Inc.*

57. FIEL Houston Inc. ("FIEL") is a membership-based not-for-profit organization based in Houston, Texas.  FIEL is an immigrant-led organization who advocates for just laws for immigrant youth, their families, access to higher education for all people regardless of immigration status and access to justice for the community.

58. FIEL provides resources for undocumented students, understanding the path to college is unsteady for many first and even second-generation Americans.  FIEL's office is open to anyone seeking guidance in their process of obtaining a higher education, including assistance with applying to college and applying for scholarships and other financial aid.  FIEL also provides a variety of immigration services for our community—from providing legal counsel for immigrants to begin their pathway to citizenship to handling most immigration cases.

59. FIEL was born out of the need for civic engagement in support of undocumented students seeking a higher education and conducts organizing for the betterment of the communities they serve, including outreach and campaigns related to the 2020 Decennial Census directed at immigrant communities in Texas.

60. Today, FIEL has approximately 11,000 members in the greater Houston area who help lead FIEL's organizing.  FIEL members reside in parts of Texas where immigrant communities of color constitute significant portions of the population, including Harris County.

61. Texas would lose at least one House seat (or not gain at least one House seat they would have gained) during the post-2020 Decennial Census apportionment process, as a result of the exclusion of undocumented immigrants from the apportionment base. The loss of political representation and political power will therefore injure FIEL's  many members who live in Texas

62. FIEL members in Houston rely on a number of government services whose funding is allocated based on population and demographics determined by the decennial Census.  This includes parents with children enrolled in Title I schools, drivers who use the roads on a daily basis and thus depend on federal highway funds to perform their jobs, and many other programs and facilities that receive Census-guided funding.  FIEL members will be deprived of the benefits of census-guided funding to which they would be entitled by a more complete census count.

63. One of the many FIEL members who will suffer injury due to the exclusion of undocumented immigrants from the apportionment base is Deyanira Palacios. Ms. Palacios is a lawful permanent resident and a resident of Montgomery County, Texas. Because Ms. Palacios resides in Texas, she will lose political power because of Texas' loss of at least one seat in the House of Representatives.

64. Another FIEL member who will suffer injury due to the exclusion of undocumented immigrants from the apportionment base is Karen Ramos. Ms. Ramos is a resident of Harris County, Texas, where she works as a realtor. Because Ms. Ramos resides in Texas, she will lose political power because of Texas' loss of at least one seat in the House of Representatives.  Ms. Ramos is entitled to remain and work lawfully in the United States through the Deferred Action for Childhood Arrivals ("DACA")

Program.  She is entitled to be counted in the ongoing 2020 Decennial Census along with all other residents of Texas, regardless of their immigration status.

65. The exclusion of undocumented immigrants from the census base count will very likely reduce the amount of federal funds that are distributed to the states and localities where Latinos, Asian-Americans, Arab-Americans, and other immigrant communities of color constitute significant portions of the population, including Texas. This will injure FIEL and its members who benefit from census-guiding funding to carry out social service, health, and education programs in these areas.

66. As an organization, FIEL has an ongoing commitment to promoting engagement in the Decennial Census among individuals served by its member organizations.  For the 2020 Decennial Census, FIEL has and will continue to invest resources in Get Out the Count efforts.

67. The Census is ongoing, with the Census Bureau's Non-Response Follow-Up just getting started.  FIEL plans to continue its Get Out the Count efforts during this Non-Response Follow-Up.  In its extensive Decennial Census outreach, FIEL will now face a more difficult environment due to the perception among undocumented immigrants in Texas that they no longer need to complete the Census now that undocumented immigrants are being excluded from the apportionment, as well as immigrant communities' heightened fear of interacting with government workers that this new policy will cause.  This fear extends not only to undocumented immigrants, but also to family and household members of undocumented immigrants who will be concerned that participating might endanger their loved ones.

68. Because of the heightened fear and suspicion created by the decision to exclude undocumented immigrants from the apportionment count, as well as confusion among undocumented communities about whether they need to or should fill out the Census in light of the Memorandum, FIEL will be forced to expend additional resources on their outreach efforts to try to reduce the negative impact of the Memorandum on the response rate in the immigrant communities they serve, particularly to undocumented immigrant communities.  Staff time and other resources devoted to FIEL's Get Out the Count efforts will diverted to communications to combat fear and disinformation resulting from the Memorandum.  Moreover, FIEL has already, and will continue to, divert resources from its other organizational priorities, including its work on access to education for students, to address these concerns about decreased census participation within immigrant communities.

69. Because of the need to increase the time and money spent on Decennial Census outreach due to the fear and confusion generated by the Administration's decision to exclude undocumented immigrants from the apportionment base, FIEL will need to divert resources from other areas critical to its mission such as other civic engagement activities.

**B.  Defendants**

70. Defendant Donald J. Trump is the President of the United States.  In that capacity, Defendant Trump issued a July 21, 2020 Memorandum on Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census, described *infra*.  As President, he has the statutory responsibility of transmitting to Congress "a statement showing *the whole number of persons* in each State, excluding Indians not taxed, as

ascertained under the seventeenth and each subsequent decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member." 2 U.S.C. § 2a (emphasis added).  He is sued in his official capacity.

71. Defendant United States Department of Commerce is a cabinet agency within the executive branch of the United States Government.  The Commerce Department is responsible for planning, designing, and implementing the 2020 Decennial Census.  13 U.S.C. § 4.

72. Defendant Wilbur L. Ross, Jr. is the Secretary of Commerce.  He oversees the Bureau of the Census ("Census Bureau") and is thus responsible for conducting the Decennial Census of the population.  13 U.S.C. § 141(a).  He has statutory responsibility to "take a decennial census of the population," 13 U.S.C. § 141(a), and for reporting to the President by January 1, 2021, a "tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States," 13 U.S.C. § 141(b).  He is sued in his official capacity.

73. Defendant Census Bureau is an agency within, and under the jurisdiction of, the Department of Commerce.  13 U.S.C. § 2.  The Census Bureau is the agency responsible for planning and administering the Decennial Census.

74. Defendant Steven Dillingham is the Director of the Census Bureau and thus has responsibility for administering a complete count of all persons residing in the United States, including for the purpose of providing that figure to the Secretary of Commerce for transmission to the President.  He is sued in his official capacity.

**FACTS**

**A.  Background on the Decennial Census**

>  ### 1.  *The Constitutional Command to Include All People in the Census for Purposes of Congressional Apportionment*

75. The Constitution requires a Decennial Census for the purpose of determining the number of Representatives to which each State is entitled.  Article I, Section 2, Clause 3 provides that "Representatives . . . shall be apportioned among the several States . . . according to their respective Numbers" (the Apportionment Clause).  U.S. Const. art. I, § 2, cl. 3.  It also directs that "[t]he actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct" (the Census Clause).  *Id.*

76. Key here, Section 2 of the Fourteenth Amendment provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting *the whole number of persons* in each State, excluding Indians not taxed."  *Id.* amend. XIV, § 2 (emphasis added).

77. "By its terms, therefore, the Constitution mandates that every ten years the federal government endeavor to count *every single person* residing in the United States, whether citizen or noncitizen, *whether living here with legal status or without*," and "[t]he population count derived from that effort is used . . . to apportion Representatives among the states."  *New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 514 (S.D.N.Y. 2019) (emphases added).

78. Consistent with this express constitutional mandate, the federal government has conducted a Census that includes all persons living in the United States, regardless of citizenship or legal status, every ten years since 1790.

79. This was historically subject to only two qualifications, both contained in the explicit text of the Constitution: "Indians not taxed," and the Three-Fifths Clause for persons who were enslaved.  The first exception has not been relevant for some time; the second, the Three-Fifths Clause, assumed that enslaved persons would be included in the Census, but provided that they would not be counted as full persons for the purposes of calculating population for congressional apportionment.

80. The explicit nature of these two qualifications, neither of which applies in modern times, reinforces that the Decennial Census and the resulting apportionment base must include every person physically living in the United States.

81. The Civil War and the abolition of slavery repudiated the Three-Fifths Clause, which the Fourteenth Amendment then repealed.  During debates over the Reconstruction Amendments, Congress considered, and affirmatively rejected, proposals that would have altered Congressional apportionment to be based on the population of voters, rather than total population.  Thaddeus Stevens introduced a constitutional amendment that would have apportioned House seats "according to their respective legal voters."  *Evenwel*, 136 S. Ct. at 1128 (quoting Cong. Globe, 39th Cong., 1st Sess., 10 (1866)).  Congress rejected that proposal.  *Id.*

82. As ratified, Section 2 of the Fourteenth Amendment carried forward the basic total population mandate of the Apportionment Clause, providing, as stated, that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed."

83. In introducing this final language on the Senate Floor, Senator Jacob Howard explained the provision as follows:

> [The] basis of representation is numbers . . . that is, the whole population except untaxed Indians and persons excluded by the State laws for rebellion or other crime . . . . The committee adopted numbers as the most just and satisfactory basis, and this is the principle upon which the Constitution itself was originally framed, that the basis of representation should depend upon numbers; and such, I think, after all, is the safest and most secure principle upon which the Government can rest. Numbers, not voters; numbers, not property; this is the theory of the Constitution.

*Evenwel*, 136 S. at 1128 (quoting Cong. Globe, 39th Cong., 1st Sess., 2766-2767 (1866)).

84. In *Evenwel v. Abbott*, the Supreme Court held that Section 2 of the Fourteenth Amendment "retained total population as the congressional apportionment base." *Evenwel*, 136 S. Ct. at 1128. The proposition that non-citizens must be included in the population base for apportioning the total number of U.S. House seats to each state was central to the Court's holding that the Fourteenth Amendment does not prohibit states from including non-citizens in drawing legislative districts within a state. The Court explained: "It cannot be that the Fourteenth Amendment calls for the apportionment of congressional districts based on total population, but simultaneously prohibits States from apportioning their own legislative districts on the same basis." *Id.* at 1129. The concurring Justices agreed that "House seats are apportioned based on total population." *Id.* at 1148 (Alito, J., concurring in the judgment); *see also id.* at 1138 (Thomas, J., concurring in the judgment) ("[F]eatures of the apportionment for the House of Representatives reflected the idea that States should wield political power in approximate proportion to their number of inhabitants."). *See also Wesberry v. Sanders*, 376 U.S. 1,

14 (1964) (noting that the "principle solemnly embodied in the Great Compromise" is

"equal representation in the House for equal numbers of people").

85. Lower courts have similarly recognized that the Constitution requires that all

people be included in the population totals used for Congressional apportionment,

regardless of citizenship status. As a three-judge panel of the District Court for the

District of Columbia explained:

> The language of the Constitution is not ambiguous.  It requires the counting of the "whole number of persons" for apportionment purposes, and while illegal aliens were not a component of the population at the time the Constitution was adopted, they are clearly "persons."  By making express provision for Indians and slaves, the Framers demonstrated their awareness that without such provisions, the language chosen would be all- inclusive. . .  We see little on which to base a conclusion that illegal aliens should now be excluded, simply because persons with their legal status were not an element of our population at the time our Constitution was written.

*Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980);

*see also, e.g.*, *New York*, 351 F. Supp. 3d at 514.

### 2.   *The Government's Repeated Acknowledgment of Its Constitutional Obligation to Include All People in the Census for Purposes of Congressional Apportionment*

86. The Justice Department has likewise not only conceded but forcefully argued

that it has a constitutional obligation to count every person residing in the United States

no matter their immigration status, and to use that data for apportionment purposes.

87. Facing a legal challenge in the early 1980s to the inclusion of undocumented

immigrants in apportionment figures in *Federation for American Immigration Reform v.

Klutznick*, the Government argued that the plaintiffs there sought "a radical revision of

the constitutionally mandated system for allocation of Representatives to the States of the

Union and an equally radical revision of the historic mission of the decennial census."

Defs.' Post-Arg. Memo. at 1, No. 79-3269 (D.D.C. Feb. 15, 1980).  It explained that the "Constitution expressly requires the enumeration of the 'whole number of persons in each State' for purposes of apportionment of Representatives to the United States Congress and none of plaintiffs' legal theories puts in doubt that the plain meaning of this language must be given effect," and that the Census "has never . . . excluded from the apportionment base any inhabitant counted in the decennial census."  Defs.' Reply Memo. & Opp'n to Pls.' Mot. for Summ. J. at 1, No. 79-3269 (D.D.C. Jan. 30, 1980).

88. The Government also rejected any policy rationale for overriding the constitutional mandate to include all persons in the enumeration for purposes of congressional apportionment, noting that the "constitutionally mandated requirement to count states' inhabitants for apportionment purposes is a matter separate from the need to solve the problems of illegal immigration."  *Id*.

89. Similarly, in a September 22, 1989 letter, Carol Crawford, the Assistant Attorney General for Legislative Affairs, advised Senator Jeff Bingaman that the Justice Department had "found no basis" for reversing its existing position that the Census Clause and Section 2 of the Fourteenth Amendment "require that inhabitants of States who are illegal aliens be included in the census count."[3]

90. More recently, in *New York v. Department of Commerce*, the Government argued in its Motion to Dismiss that the "Constitution supplies a simple judicial standard for determining the constitutionality of [Census Bureau] practices—the Secretary must perform a person-by-person headcount, rather than an estimate of population."  Memo. of

---

[3] Letter from Assistant Attorney Gen. Carol T. Crawford to Honorable Jeff Bingaman (Sept. 22, 1989), *in* 135 Cong. Rec. S22,521 (daily ed. Sept. 29, 1989).

Law in Support of Defs.' Mot. to Dismiss at 25, No. 1:18-cv-02921, ECF No. 155

(S.D.N.Y. May 25, 2018).  Similarly, it contended that "where, as here, there is no

allegation that the Secretary failed to establish procedures for counting every person, a

case ceases to implicate 'actual Enumeration . . . .'"  Reply Memo. of Law in Further

Support of Defs.' Mot. to Dismiss at 7, No. 1:18-cv-02921, ECF No. 190 (S.D.N.Y. July

13, 2018).

91. The Government embraced the requirement that every person living in the

United States must be included in the Census even more directly in its Post-Trial

Proposed Findings of Fact in *New York v. Department of Commerce*, writing that the

"Constitution requires the federal government to conduct a Decennial Census counting

the total number of 'persons'—with no reference to citizenship status—residing in each

state."  Defs.' Post-Trial Proposed Findings of Fact and Conclusions of Law Regarding

Pls.' Claims at 1, No. 1:18-cv-02921, ECF No. 546 (S.D.N.Y. Nov. 21, 2018) (internal

citations omitted).

92. Even more recently, in ongoing litigation in Alabama over the inclusion of

undocumented immigrants in the Census, the Government argued that "[t]he very

purpose of the census . . . is to count the number of people residing in each state."

Memo. of Law in Support of Defs.' Mot. to Dismiss at 1, *Alabama v. Dep't of*

*Commerce*, No. 2:18-cv-00772, ECF No. 45-1 (N.D. Ala. Nov. 13, 2019).

### 3.   *The Statutory Requirements to Include All People in the Census for Purposes of Congressional Apportionment*

93. Article I, Section 2 of the Constitution provides that the Census may be

conducted "in such manner as [Congress] shall direct by law."  Congress has codified this

command in a statutory scheme primarily contained in Title 13 of the United States Code, also known as the Census Act.

94. Congress delegated to the Secretary of Commerce responsibility for conducting the Census, providing that he "shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year, which date shall be known as the 'decennial census date' . . . ."  13 U.S.C. § 141(a).

95. Congress has also created the Census Bureau within the Department of Commerce and authorized the Secretary of Commerce to delegate his duties under the Census Act to the Census Bureau.  13 U.S.C. §§ 2, 4.

96. The Secretary must report to the President a "tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States" within nine months of the Census date.  13 U.S.C. § 141(b).

97. The President then performs a "ministerial" calculation of the number of U.S. House seats to which each state is entitled.  *Franklin v. Massachusetts*, 505 U.S. 788, 799 (1992).  The President is "require[d]" to use only "data from the decennial census" to perform this calculation, *id.* at 797, and the calculation must use a specific formula with "rigid specifications . . . provided by Congress itself, and to which there can be but one mathematical answer."  *Id.* at 799 (quoting S. Rep. No. 2, 71st Cong., 1st Sess., at 4–5).

98. The President must then transmit to Congress, "[o]n the first day, or within one week thereafter, of the first regular session . . . a statement showing *the whole number of persons* in each State . . . as ascertained under the . . . decennial census of the population," and "the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives *by the method*

28

*known as the method of equal proportions*." 2 U.S.C. § 2a (emphases added).  The

"method of equal proportions" is the specific formula prescribed by Congress that

calculates the number of House seats for each state based on the total population of each

state as enumerated in the Decennial Census.

99. Though the primary purpose of the Census enumeration remains the

apportionment of Congressional seats (as well as, by extension, Presidential electors), the

population count from the Decennial Census is also used by the states for decennial

redistricting of state legislative districts; helps to determine the distribution of hundreds

of billions of dollars of federal funding; and informs the decisions of federal, state, and

local policymakers and private businesses.

> ### 4. The Census Bureau's Repeated Acknowledgments that All People Must Be Included in the 2020 Census for Purposes of Congressional Apportionment

100.    After more than a decade of preparation, the 2020 Census is currently

being conducted, with "Census Day" having occurred on April 1.  Beginning in January

in some places, and in March nationwide, Americans were asked to respond to the

Census questionnaire online, by phone, or by mail.  And while there have been some

delays due to the COVID-19 pandemic, in-person NRFU is currently scheduled to take

place between August 11 and October 31.[4]

101.    Throughout the entire process of preparing for and conducting the 2020

Census, the Census Bureau has consistently represented that it would adhere to the

---

[4] *See* Census Bureau, *Overall Timeline*, https://2020census.gov/en/important-dates.html (last visited July 21, 2020).

centuries-old practice of counting every person living in the United States—including undocumented immigrants—for apportionment and other purposes.

102.    In fact, the Census Bureau has formally adopted a rule—pursuant to a notice-and-comment rulemaking process—that undocumented immigrants must be counted where they live and included in apportionment numbers.  On February 8, 2018, the Census Bureau promulgated its "Residence Rule" for the 2020 Census, which lays out this requirement.  83 Fed. Reg. 5525 (Feb. 8, 2018) (formally titled "Final 2020 Census Residence Criteria and Residence Situations.").

103.    The Residence Rule explains that the "residence criteria" are "used to determine where people are counted during each decennial census."  *Id*. at 5526.  The Residence Rule indicates that the criteria for determining residency set forth in the rule must then be used "to apportion the seats in the U.S. House of Representatives among the states" and that "[a]pportionment is based on the resident population, plus a count of overseas federal employees, for each of the 50 states."  *Id*. at 5526 n.1.

104.    The Residence Rule provides that "[c]itizens of foreign countries living in the United States" must be "[c]ounted at the U.S. residence where they live and sleep most of the time."  *Id*. at 5533.  The Census Bureau elaborated that the "Census Bureau is committed to counting every person in the 2020 Census," including citizens of foreign countries living in the United States.  *Id*. at 5526.  The Census Bureau considered a comment which "expressed concern about the impact of including undocumented people

in the population counts for redistricting because these people cannot vote."[5]  In response, the Census Bureau declined to make any changes to its residence criteria and indicated that it "will retain the proposed residence situation guidance for foreign citizens in the United States."  *Id.* at 5530.

105.    As of July 21, 2020, a copy of these criteria was available unchanged on the Census Bureau website, including the provision for foreign citizens:[6]

3.    **FOREIGN CITIZENS IN THE UNITED STATES**
    a) *Citizens of foreign countries living in the United States* - Counted at the U.S. residence where they live and sleep most of the time.
    b) *Citizens of foreign countries living in the United States who are members of the diplomatic community* - Counted at the embassy, consulate, United Nations' facility, or other residences where diplomats live.
    c) *Citizens of foreign countries visiting the United States, such as on a vacation or business trip* - Not counted in the census.

106.    As of July 21, 2020, a webpage maintained by the Census Bureau addressing "Frequently Asked Questions on Congressional Apportionment" noted that resident population counts "include all people (citizens and non-citizens) who are living in the United States at the time of the census," and explicitly affirmed that undocumented residents must be included in the population totals used for Congressional apportionment:[7]

---

[5] Final 2020 Census Residence Criteria and Residence Situations, Federal Register, Vol. 83, No. 27, Thursday, February 8, 2018, https://www.govinfo.gov/content/pkg/FR-2018-02-08/pdf/2018-02370.pdf (last visited July 21, 2020).

[6] Census Bureau, *Residence Criteria and Residence Situations for the 2020 Census of the United States*, https://www.census.gov/content/dam/Census/programs-surveys/decennial/2020-census/2020-Census-Residence-Criteria.pdf (last visited July 21, 2020).

[7] Census Bureau, Frequently Asked Questions on Congressional Apportionment, https://www.census.gov/topics/public-sector/congressional-apportionment/about/faqs.html#Q6 (last visited July 21, 2020).

## Who is included in the apportionment population counts?

The apportionment population count for each of the 50 states includes the state's total resident population (citizens and non-citizens) plus a count of the overseas federal employees (and dependents) who have that state listed as their home state in their employers' administrative records.

For details on who is counted (and where they are counted) in the 2020 Census, see the 2020 Census Residence Criteria and Residence Situations.

Back to top

## Who is included in the resident population counts?

The resident population counts include all people (citizens and non-citizens) who are living in the United States at the time of the census. People are counted at their usual residence, which is the place where they live and sleep most of the time.

The resident population also includes military and civilian employees of the U.S. government who are deployed outside the United States (while stationed and assigned in the United States) and can be allocated to a usual residence address in the United States based on administrative records from the Department of Defense.

## Are undocumented residents included in the apportionment population counts?

Yes, all people (citizens and noncitizens) with a usual residence in the 50 states are included in the resident population for the census, which means they are all included in the apportionment counts.

Back to top

107.    Likewise, as of July 21, the "Census in the Constitution" page on the

Census Bureau website noted that "[t]he plan [of the Founders] was to count every person

living in the United States of America, and to use that count to determine representation

in Congress:"[8]

---

[8] Census Bureau, *Census in the Constitution*, https://www.census.gov/programs-surveys/decennial-census/about/census-constitution.html (last visited July 21, 2020).

# Census in the Constitution

## Why Jefferson, Madison and the Founders Enshrined the Census in our Constitution

The U.S. Constitution empowers the Congress to carry out the census in "such manner as they shall by Law direct" (Article I, Section 2). The Founders of our fledgling nation had a bold and ambitious plan to empower the people over their new government. The plan was to count every person living in the newly created United States of America, and to use that count to determine representation in the Congress.

108.    Similarly, the Census Bureau's 2020 guide for Complete Count Committees, which are volunteer organizations designed to boost Census participation, advised that the Census "mandates a headcount every 10 years of everyone residing in the 50 states," including "citizens, and noncitizens:"[9]

## WHY DO WE TAKE THE CENSUS?

The U.S. Constitution (Article I, Section 2) mandates a headcount every 10 years of everyone residing in the 50 states, Puerto Rico, and the Island Areas of the United States. This includes people of all ages, races, ethnic groups, citizens, and noncitizens. The first census was conducted in 1790 and one has been conducted every 10 years since then.

---

[9] Census Bureau, *2020 Census Complete Count Committee Guide* at 1 (2018), https://www.census.gov/content/dam/Census/newsroom/press-kits/2018/ccc-guide-d-1280.pdf (last visited July 21, 2020).

109.    Similarly, on its webpage "Setting the Record Straight," as of July 21, 2020, the Census Bureau assured readers that "[e]veryone counts" and that "everyone living" in the United States, including non-citizens, is counted in the 2020 Census:[10]

## Setting the Record Straight

### Does the 2020 Census ask about citizenship status?

**NO.** The 2020 Census does not ask whether you or anyone in your home is a U.S. citizen.

### Are non-citizens counted in the census?

**YES.** Everyone counts. The 2020 Census counts everyone living in the country, including non-citizens. Learn more about who should be counted when you complete the 2020 Census.

110.    As of July 21, the Bureau's "Who to Count" page repeated the same information:[11]

---

[10] Census Bureau, *Setting the Record Straight*, https://2020census.gov/en/news-events/rumors.html (last visited July 21, 2020).

[11] Census Bureau, *Who to Count*, https://2020census.gov/en/who-to-count.html (last visited July 21, 2020).

⊕ Visitors on Census Day
_____

⊖ Foreign Citizens in the United States

　　Citizens of foreign countries who are living in the United States, including
　　members of the diplomatic community, should be counted at the U.S.
　　residence where they live and sleep most of time.

　　Citizens of foreign countries who are temporarily visiting the United States on
　　vacation or business on April 1, 2020, should not be counted.

　　Back to Top

⊕ Living Outside the United States
_____

111.　　And, as of July 21, the "Who Is Required to Respond" page on the Census

Bureau's website for the 2020 Census also specified that "[e]veryone living in the United

States . . . is required by law to be counted in the 2020 Census:"[12]

# Who Is Required To Respond?

Everyone living in the United States and its five territories is
required by law to be counted in the 2020 Census.

112.　　The 2020 Census is in process, but at this point remains far from

enumerating the entire population.  As of July 23, 2020, 62.3% of households in the

United States have responded to the 2020 Census, according to the Census Bureau's

estimates.[13]  Included within this figure are likely significant numbers of undocumented

immigrants who acted in good faith according to the Bureau's own instructions and

_____

[12] Census Bureau, *Who Is Required to Respond*, https://2020census.gov/en/am-i-
required.html (last visited July 21, 2020).

[13] Census Bureau, *Response Rates*, https://2020census.gov/en/response-rates.html (last
visited July 21, 2020).

responded to the census, with the understanding that they would be counted just like every other person living in the United States.

**B.  Defendants' First Attempt to Exclude Noncitizens from the Census: The Citizenship Question Litigation**

113.    This is not the first effort by Defendants to exclude noncitizens from the 2020 Census.  Most notably, following the Secretary's March 2018 announcement that a citizenship question would be included on the Census, numerous plaintiffs, including Plaintiffs here, filed suit to block the question.  After an eight-day bench trial, this Court issued a 277-page opinion and order including its findings of fact and conclusions of law.  *See New York*, 351 F. Supp. 3d 502.  The Court concluded that Plaintiffs had standing to sue because the inclusion of a citizenship question on the Census would deter participation in the Census by households with a noncitizen, leading to an undercount of such households, and that Defendants violated the Administrative Procedure Act in various ways, including by offering a "pretextual" rationale, *id.* at 516—Voting Rights Act ("VRA") enforcement—for the Secretary's decision.  *Id.* at 516.

114.    The Supreme Court affirmed, finding that the Secretary's VRA rationale was "incongruent with what the record reveal[ed] about the agency's priorities and decision-making process" and "contrived."  *Dep't of Commerce*, 139 S. Ct. at 2575-76.  The Secretary's March 2018 decision thus failed the basic requirement that agencies "pursue their goals reasonably," and was unlawful.  *Id.* at 2576.

115.    The Secretary's "contrived" pretext was pierced during discovery in a separate state court lawsuit, *Common Cause v. Lewis*, No. 18-CVS-14001 (N.C. Super. Ct.), where information that had been wrongfully concealed in discovery before this

Court revealed the true genesis of the decision to add a citizenship question to the 2020

Census.  The evidence was discovered on the hard drive of Dr. Thomas Hofeller, a North

Carolina-based longtime Republican strategist and redistricting expert who died in

August 2018.[14]

116.    In late August 2015, Hofeller was commissioned by the Washington Free

Beacon, a conservative website, to study the "practicality" and "political and

demographic effects" of using citizen voting age population ("CVAP") instead of total

population ("TPOP") to achieve equal population in redistricting.[15]  Hofeller advised that

if a citizenship question were added to the 2020 Decennial Census so as to enable the

exclusion of non-citizens from the population base in redistricting, the results "would be

advantageous to Republicans and Non-Hispanic Whites."[16]

117.    Documents also revealed that Hofeller in 2015 communicated directly

with Census Bureau official Christa Jones, using her private email address, and that Jones

notified Hofeller of the Federal Register's notice for comment regarding the Census

Bureau's Content Test for that year, suggesting that there was "an opportunity to mention

citizenship."[17]  Hofeller subsequently helped ghostwrite a draft DOJ letter to Commerce

---

[14] Michael Wines, *Thomas Hofeller, Republican Master of Political Maps, Dies at 75*,
N.Y. Times (Apr. 21, 2018) https://www.nytimes.com/2018/08/21/obituaries/thomas-
hofeller-republican-master-of-political-maps-dies-at-75.html.

[15] Pls.' Mot. for Order to Show Cause Ex. C at 1-2, *New York v. Dep't of Commerce*, No.
18-CV-2921, ECF No. 595-1 (S.D.N.Y. May 31, 2019).

[16] Pls.' Mot. for Order to Show Cause Ex. D at 9, *New York v. Dep't of Commerce*, No.
18-CV-2921, ECF No. 595-1 (S.D.N.Y. May 31, 2019).

[17] Tara Bahrampour, *GOP strategist and census official discussed citizenship question,
new documents filed by lawyers suggest*, Wash. Post (June 16, 2019),
https://www.washingtonpost.com/dc-md-va/2019/06/15/new-documents-suggest-direct-

requesting a citizenship question that subsequently came into the possession of his "good friend[]" Mark Neuman, Defendant Secretary Ross's "trusted" and "expert adviser" on census issues, who "act[ed] analogously to an agency employee."[18]  Following a call between then-North Carolina Congressman (and now Defendant Trump's Chief of Staff) Mark Meadows and Defendant Secretary Ross, senior aides of Secretary Ross facilitated a meeting at which Neuman provided Hofeller's draft to John Gore, the Acting Assistant Attorney General for Civil Rights, who ultimately "requested" that the Bureau include a citizenship question on the census.[19]  Meanwhile, Jones eventually came to serve as Chief of Staff to the Acting Director of the Census Bureau at the time of Defendant Secretary Ross's March 2018 Decision Memorandum ordering the inclusion of a citizenship question on the census.  Jones later testified that Hofeller favored adding a citizenship question to the census to aid "the Republican redistricting effort" and that Hofeller's business partner, Dale Oldham, advocated for a citizenship question for redistricting and apportionment purposes "more times than I can remember."[20]

---

connection-between-republican-redistricting-strategist-census-bureau-official-over-citizenship-question/.

[18] NYIC Pls.' Mot for Sanctions, 1:18-cv-2921 (JMF), ECF No. 635-1 at 124-136; Def's Opp. to Ltr. Mot. to Compel, *N.Y. Immigration Coalition v. U.S. Dep't of Commerce*, 1:18-cv-2921-JMF, ECF No. 451 at 3 (S.D.N.Y. Oct. 30, 2018).

[19] Pls.' Joint Proposed Post-Trial Findings of Fact, *N.Y. Immigration Coalition v. U.S. Dep't of Commerce*, 1:18-cv-2921-JMF, ECF No. 545 at 52-53 ¶¶ 364-69 (S.D.N.Y. Nov. 21, 2018) (citing trial exhibits).

[20] Memorandum from Acting Chairwoman Carolyn B. Maloney to Members of the United States House Committee on Oversight, *Update on Investigation of Census Citizenship Question Since House Held Attorney General Barr and Commerce Secretary Ross in Contempt of Congress*, 12 (Nov. 12, 2019) https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-11-12.Memo%20to%20COR%20Members%20re.%20Census.pdf.

118.    Subsequent statements by Defendant Trump and other Administration officials and advisors confirmed that a discriminatory intent to exclude noncitizens—and particularly, undocumented immigrants—from redistricting was the actual purpose of the effort to add a citizenship question to the Census.

119.    For example, on July 1, 2020, Defendant Trump stated that a citizenship question was "very important to find out if someone is a citizen as opposed to an illegal," and that "Democrats want to treat the illegals, with healthcare and other things, better than they treat the citizens of this country."[21]

120.    Defendant Trump himself has repeatedly admitted that his administration sought to add the citizenship question to harm immigrant communities by excluding them from the decennial enumeration and thus from redistricting and apportionment.  About a week after the Supreme Court's holding in *Department of Commerce*, Defendant Trump, asked why he was still trying to get a citizenship question on the census, said: "Number one, you need it for Congress.  You need it for Congress, for districting.  You need it for appropriations.  Where are the funds going?  How many people are there?"[22]

121.    Days later, at a press conference in the White House Rose Garden, Defendant Trump similarly stated that the citizenship information his administration sought is "relevant to administering our elections.  Some states may want to draw state

---

[21] *Remarks by President Trump at Signing of H.R. 3401*, White House (July 1, 2019) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-signing-h-r-3401/.

[22] Remarks by President Trump Before Marine One Departure, White House (July 5, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-51/).

and local legislative districts based upon the voter-eligible population."[23]  In particular,

Defendant Trump urged states to apportion and redistrict on the basis of citizen voting

age population instead of total population, as Hofeller had advised, because he suggested

that the move might be immune from judicial scrutiny: "Indeed, the same day the

Supreme Court handed down the census decision, it also said it would not review certain

types of districting decisions, which could encourage states to make such decisions based

on voter eligibility."[24]

122.    At the same press conference, Defendant Trump stated: "As shocking as it

may be, far-left Democrats in our country are determined to conceal the number of illegal

aliens in our midst.  They probably know the number is far greater, much higher than

anyone would have believed before.  Maybe that's why they fight so hard.  This is part of

a broader left-wing effort to erode the rights of the American citizen."[25]

123.    Several of Defendant Trump's associates and agents also stated—in the

wake of the Supreme Court's ruling in *Department of Commerce*—that excluding

noncitizens from the census is necessary either to curtail immigration or limit the political

power of immigrant communities of color.

124.    Matt Schlapp, Chairman of the American Conservative Union and

husband to Mercedes Schlapp, Defendant Trump's Director of Strategic

Communications, tweeted on June 27, 2019 that he wanted to "impeach[] the Chief

---

[23] *Remarks by President Trump on Citizenship and the Census*, White House (July 11, 2019) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-citizenship-census/.

[24] *Id.*

[25] *Id.*

Justice [Roberts]" for "angling for vast numbers of illegal residents to help Dems hold Congress."[26]

125.    Former Vice Chair of the President's Commission on Electoral Integrity and anti-immigrant zealot Kris Kobach stated on July 8, 2019 that he "advised the President on putting the citizenship question back on the U.S. Census," adding that he wanted to "make it a requirement in federal law that we must ask the question in every census going forward."[27]  A supplement to the Administrative Record in the citizenship question litigation revealed that Secretary Ross (at the behest of former White House senior advisor Steve Bannon) had discussed adding a citizenship question with Kobach, who advised that the question's absence on the census "leads to the problem that aliens … are still counted for congressional apportionment purposes."  In separate public statements, Kobach reiterated that the purpose of adding a citizenship question to the census was "so Congress [can] consider excluding illegal aliens from the apportionment process,"[28] because "citizens in a district with lots of illegal aliens have more voting power than citizens in districts with few illegal aliens."[29]

---

[26] Matt Schlapp (@mschlapp),, Twitter (June 27, 2019, 8:29 AM), https://twitter.com/mschlapp/status/1144266564935528449.

[27] Pilar Pedraza (@PilarPedrazaTV), Twitter (July 8, 2019), https://twitter.com/PilarPedrazaTV/status/1148296665894381508.

[28] Kris Kobach, *Exclusive—Kobach: Bring the Citizenship Question Back to the Census*, Breitbart (Jan. 30, 2018), http://www.breitbart.com/big-government/2018/01/30/exclusive-kobach-bring-citizenship-question-back-census/.

[29] Kris Kobach, *Why the Citizenship Question is So Important*, Breitbart (June 27, 2019), https://www.breitbart.com/politics/2019/06/27/kobach-why-the-citizenship-question-is-so-important/.

126.    Defendant Trump has also repeatedly denigrated and dehumanized non-white immigrants.  He has stated that certain immigrants "aren't people, these are animals,"[30] and his administration has housed immigrant children in cages and separated them from their families.[31]  Indeed, Defendant Trump has long complained about the growth of immigrant communities of color, tweeting in 2015: "How crazy - 7.5% of all births in U.S. are to illegal immigrants, over 300,000 babies per year. This must stop."[32]

127.    Secretary Ross has publicly supported the Trump Administration's anti-immigrant agenda, applauding Trump Administration programs to "swiftly return illegal entrants" and to "stop sanctuary cities, asylum abuse, and chain immigration."[33]

128.    This slew of public statements and actions—from Defendant Trump and some of his highest-level advisers and administration officials—shows clearly that the true rationale for a adding a citizenship question is driven by racial animus against immigrants of color and a desire to curb the political power of immigrant communities of color.

### C.  The Presidential Memorandum to Exclude Undocumented Immigrants from the Census

---

[30] Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times, May 16, 2018, https://www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.

[31] BBC, *Trump migrant separation policy: Children 'in cages' in Texas*, June 18, 2018, BBC News, https://www.bbc.com/news/world-us-canada-44518942.

[32] Donald Trump (@realDonaldTrump), Twitter (Aug. 21, 2015 6:56 AM), https://twitter.com/realdonaldtrump/status/634725641972248576.

[33] Press Release, Commerce Dep't, Statement From U.S. Secretary of Commerce Wilbur Ross on the Release of President Trump's Immigration Priorities (Oct. 9, 2017), https://www.commerce.gov/news/press-releases/2017/10/statement-us-secretary-commerce-wilbur-ross-release-president-trumps.

129.    Where subterfuge has failed, Defendants have now turned to executive fiat.  Barred from including a citizenship question on the 2020 Census, Defendants have now contrived a new scheme to identify and directly exclude undocumented immigrants from the Actual Enumeration required for apportionment.  On July 21, 2020, Defendant Trump issued a presidential memorandum to the Secretary of Commerce entitled, "Memorandum on Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census."[34]

130.    The Memorandum wrongly asserts that "[t]he Constitution does not specifically define which persons must be included in the apportionment base," that "persons in each state" has been interpreted to mean "inhabitants," that the scope of the term "inhabitants" requires "the exercise of judgment," and that the President purportedly has discretion to exercise that judgment to exclude entire categories of persons who reside in the United States.  *Id*.

131.    On this asserted legal basis, the Memorandum declares that for reapportionment following the 2020 Census, "it is the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act, as amended (8 U.S.C. 1101 et seq.), to the maximum extent feasible and consistent with the discretion delegated to the executive branch."  *Id*. § 2.

132.    The Memorandum states that the Secretary, in submitting his Census report under 13 U.S.C. § 141(b), "shall take all appropriate action, consistent with the

---

[34] *Available at* https://www.whitehouse.gov/presidential-actions/memorandum-excluding-illegal-aliens-apportionment-base-following-2020-census/.

Constitution and other applicable law" to provide information to the President to allow for the exclusion of undocumented immigrants. *Id*. § 3.

133.    By its explicit and emphatic declaration of federal policy, the Memorandum directs the Commerce Department (and through the Commerce Department, the Census Bureau) to take steps to allow the President to exclude undocumented immigrants in his apportionment report to Congress issued under 2 U.S.C. § 2(a). *Id*.  This includes, but is not limited to, "provid[ing] information" in the report that the Secretary must provide to the President under 13 U.S.C. § 141(b) that will "permit[] the President" to exclude undocumented immigrants in calculating the number of U.S. House seats to which each state is entitle. *Id*.

134.    The Memorandum asserts that excluding undocumented immigrants is justified because "the principles of representative democracy" are undermined by tying the political influence of states to a population that includes undocumented immigrants. Memorandum, § 2.

135.    In an accompanying statement, Defendant Trump declared that the Memorandum followed through on his commitment to determine the citizenship status of the population, and argued that "the radical left is trying to erase the existence of [the concept of American citizenship] and conceal the number of illegal aliens in our country" as "part of a broader left-wing effort to erode the rights of Americans [sic] citizens."[35] The statement repeated the Memorandum's argument that counting undocumented

---

[35] President Donald Trump, *Statement from the President Regarding Apportionment* (July 21, 2020), https://www.whitehouse.gov/briefings-statements/statement-president-regarding-apportionment/.

immigrants creates "perverse incentives," and that "we should not give political power to people who should not be here at all."[36]

136.    Upon information and belief, following receipt of the Memorandum, the Department of Commerce has issued directives to the Census Bureau, constituting final agency action, to implement the policy of excluding noncitizens from the enumeration used for congressional apportionment, as set forth in the Memorandum.

137.    On June 23, 2020, Defendant Trump's re-election campaign sent an email making plain that the intent of the Memorandum is to undermine the Census and demonize immigrants.  The email characterized the Memorandum as an "Executive Order" that "will block" undocumented people from "receiving congressional representation" and from "being counted in the U.S. Census."[37]  The email claimed that this "Executive Order" was necessary because "Democrats are prioritizing dangerous, unlawful immigrants over American Citizens."[38]

### D.  The Effect of Excluding Undocumented Immigrants from the Census

---

[36] *Id.*

[37] Hansi Lo Wang (@hansilowang), TWITTER (July 23, 2020, 3:34 PM), https://twitter.com/hansilowang/status/1286384297314844672.

[38] *Id.  See also* Tara Bahrampour, *Trump's reelection campaign calls for adding citizenship question to 2020 census amid criticism that he is politicizing the count*, Wash. Post (Mar. 20, 2018), https://www.washingtonpost.com/local/social-issues/trump-campaign-calls-for-adding-citizenship-question-to-2020-census-amid-accusations-that-the-president-is-politicizing-the-annual-count/2018/03/20/dd5929fe-2c62-11e8-b0b0-f706877db618_story.html (describing a "Trump reelection campaign" email that asked supporters whether they "support[ed] the president in adding a citizenship question" to the Census and noting that critics described the email as "demoralizing," "an assault on the constitution," and "a sly attempt to rally the president's base").

138.    Pew Research Center has estimated that the total population of undocumented immigrants in the United States was 10.5 million people in 2017.[39]  The Department of Homeland Security (DHS) has estimated that the total population of undocumented immigrants in the United States was 12 million in 2015.[40]

139.    California, Texas, and New York are consistently three of the states with the largest populations of undocumented residents.

140.    According to Pew Research Center, California had 2 million undocumented residents, Texas had 1.6 million undocumented residents, and New York had 650,000 undocumented residents in 2017, subject to an upward or downward variance of 50,000 people for each estimate.[41]

141.    According to DHS, California had 2.9 million undocumented residents, Texas had 1.9 million undocumented residents, and New York had 590,000 undocumented residents in 2015.[42]

142.    The current average population of each U.S. House district is 710,767 people.

---

[39]  Jeffrey S. Passel and D'Vera Cohn, *Mexicans decline to less than half the U.S. unauthorized immigrant population for the first time*, Pew Research Ctr. (June 12, 2019), https://www.pewresearch.org/fact-tank/2019/06/12/us-unauthorized-immigrant-population-2017/.

[40] Office of Immigration Statistics, U.S. Dep't of Homeland Sec., *Population Estimates: Illegal Alien Population Residing in the United States: January 2015* at 2 (Dec. 2018), https://www.dhs.gov/sites/default/files/publications/18_1214_PLCY_pops-est-report.pdf.

[41] Passel and Cohn, *supra* note 38.

[42] Office of Immigration Statistics, *supra* note 46.

143.    The Memorandum expressly aims to alter Congressional apportionment based on states' undocumented populations.  For example, it argues that "[i]ncreasing congressional representation based on the presence of aliens who are not in a lawful immigration status would also create perverse incentives encouraging violations of Federal law."  Memorandum§ 2.

144.    Of these states, the Memorandum specifically targets California, anticipating that excluding undocumented immigrants from the census would deprive California of multiple House seats (an thus, Electoral College votes).  The Memorandum states: "Current estimates suggest that one State is home to more than 2.2 million illegal aliens, constituting more than 6 percent of the State's entire population.  Including these illegal aliens in the population of the State for the purpose of apportionment could result in the allocation of two or three more congressional seats than would otherwise be allocated."  *Id*.  Upon information and belief, this "one State" is California.

145.    Unlawfully excluding undocumented residents from the population count used for apportionment will likely deprive several states—most particularly, Arizona, California, New York, and Texas—of at least one House seat (or will cause not to gain at least one House seat they would have gained) during the post-2020 Decennial Census apportionment process.

146.    Indeed, this Court found that Arizona, California, Florida, Illinois, New York, and Texas all faced a substantial certainty of losing a seat based on a differential undercount of 5.8% of all noncitizens in the 2020 census.  *New York*, 351 F. Supp. 3d at 594, *aff'd in relevant part*, 139 S. Ct. 2551.  The evidence upon which the Court based these findings—the testimony of Dr. Chris Warshaw—relied on smaller undercounts of

noncitizens in each of these states than would be caused by the Memorandum.  *See id.*
(citing Warshaw Decl., Dkt. No. 526-1).  A greater impact will occur for these states if
**100%** of undocumented immigrants are removed from the apportionment count.  Other
studies have also confirmed the certainty that various states would lose a seat if
undocumented residents are removed.[43]

147.    But the effects of the Memorandum are likely to run even deeper.  Like
the failed effort to add a citizenship question to the census, the new policy of excluding
undocumented immigrants from the census will broadcast a xenophobic message to
immigrant communities about census participation, suppressing responses from
households containing immigrants and noncitizens.  This will result in the omission from
the census not only of undocumented immigrants, but also noncitizen immigrants with
legal status and United States citizens.  The resulting undercount will harm the work of
organizations—including that of the Plaintiffs here—in promoting census participation
and will further strip representation and economic resources from communities with
immigrant populations.

###     E.     The Census Bureau's Likely Use of Statistical Modeling to Estimate the Undocumented Population

---

[43] *See* Amelia Thomson-DeVeaux, *The Citizenship Question Could Cost California And Texas A Seat In Congress*, FiveThirtyEight (June 17, 2019),
https://fivethirtyeight.com/features/the-citizenship-question-could-cost-california-and-texas-a-seat-in-congress/ (finding California, Arizona, and Texas would lose at least one seat in a poorly conducted census and 10% of households with undocumented immigrants undercounted).  While there are questions about the accuracy of its expert's methodology, the State of Alabama has asserted essentially the same thing in separate litigation.  *See* Expert Report of Dudley Poston at 28, *Alabama v. U.S. Dep't of Commerce*, No. 2:18-cv-00772-RD (N.D. Ala.) (opining that excluding undocumented residents from apportionment base would cause California, Texas, and New Jersey to lose seats).

148.    The Census Bureau does not have a means to individually enumerate undocumented immigrants separate and apart from the rest of the population in each jurisdiction.

149.    After completion of the citizenship question litigation, the Census Bureau indicated that it would seek to compile citizenship status information for Census respondents by using administrative records, including records from the Social Security Administration.  Such administrative records, however, do not provide information as to *legal status*, as opposed to citizenship, and cannot be used to determine whether census respondents are *undocumented immigrants* specifically.

150.    In fact, the Government has recently represented in separate litigation, via a declaration by Census Bureau Senior Advisor Enrique Lamas, that it "lack[s] . . . accurate estimates of the resident undocumented population" on a state-by-state basis.[44]

---

[44] Defendants' Supp. Rule 26(a)(1) Disclosures and Rule 26(a)(2)(C) Disclosures, *State of Alabama v. Dep't of Commerce*, Case No. 2:18-cv-00772-RDP (N.D. Ala. March 13, 2020). *See also* Jeffrey Mervis, *Why the U.S. Census Bureau could have trouble complying with Trump's order to count citizens*, Science Mag. (Sept. 16, 2019), https://www.sciencemag.org/news/2019/09/why-us-census-bureau-could-have-trouble-complying-trump-s-order-count-citizens (detailing the "formidable challenge" in relying on administrative records); Comment from Campaign Legal Center, OMB Control Number 0607-0995, https://campaignlegal.org/sites/default/files/2020-01/Final%20Campaign%20Legal%20Center%20Comment%20OMB%20Control%20No%200607-0995.pdf (noting that "[s]tate administrative data on individual citizenship status are notoriously riddled with errors and outdated information" and "records misidentify naturalized U.S. citizens as non-U.S. citizens"); Jennifer Van Hook, *Counting 11 million undocumented immigrants is easier than Trump thinks*, The Conversation (July 17, 2019), https://theconversation.com/counting-11-million-undocumented-immigrants-is-easier-than-trump-thinks-120459 (observing that administrative records provide "inconsistent information about the same person," have "limited value for describing those who fall outside of the administrative records system," and will require researchers to "make assumptions about coverage error").

151.     In the absence of means to actually enumerate the total population of the United States minus undocumented immigrants, the Government has indicated its intention to use statistical modeling to estimate the undocumented population and thereby calculate an apportionment population that excludes undocumented immigrants.  In separate litigation, Department of Justice attorney Stephen Ehrlich recently stated in a hearing that "there may need to be some statistical modeling" in order to carry out the Memorandum, though the Government had not yet "formulated a methodology."[45]

152.     This statement is consistent with the previous efforts of governmental and non-governmental actors that have endeavored to project the population of undocumented immigrants in the United States.  For example, Pew Research Center compiles statistical estimates of the population of undocumented immigrants rather than an actual enumeration, making a variety of statistical adjustments to the census population numbers and weighting the data.[46]  DHS has similarly used statistical sampling methodology, the residual method, for estimated the populations of undocumented immigrants. [47]

153.     The scope of any statistical model required to estimate the number of undocumented immigrants would be unprecedented for use in calculating the

[45] Hansi Lo Wang (@hansilowang), Twitter (July 22, 2020, 10:58 AM), https://twitter.com/hansilowang/status/1285952274410409985

[46] *See*, J. Passel, *Measuring illegal immigration: How Pew Research Center counts unauthorized immigrants in the US* (July 12, 2019), https://www.pewresearch.org/fact-tank/2019/07/12/how-pew-research-center-counts-unauthorized-immigrants-in-us/.

[47] Office of Immigration Statistics, U.S. Dep't of Homeland Sec., *Population Estimates: Illegal Alien Population Residing in the United States: January 2015* at 2 (Dec. 2018), https://www.dhs.gov/sites/default/files/publications/18_1214_PLCY_pops-est-report.pdf. DHS has not performed any estimates of the population of undocumented immigrants for any year since 2015.

apportionment population.  Such statistical processes are not an "actual Enumeration" as

required under Article I of the Constitution.  *See Dep't of Commerce v. U.S. House of*

*Representatives*, 525 U.S. 316, 338 (1999); *id.* at 346 (Scalia, J., concurring) ("It is in my

view unquestionably doubtful whether the constitutional requirement of an 'actual

Enumeration,' Art. I, § 2, cl. 3, is satisfied by statistical sampling.").

**CAUSES OF ACTION**

**COUNT ONE**
**Violation of Enumeration and Apportionment**
**(Article I, Section 2, Clause 3 of the Constitution,**
**and Section 2 of the Fourteenth Amendment)**
**(All Plaintiffs against All Defendants)**

154.    Plaintiffs repeat and re-allege by reference all of the previous allegations

in this Complaint.

155.    The Constitution requires that the apportionment of seats for the House of

Representatives be conducted on the basis of the total population of all persons in each

state, following each Decennial Census.

156.    In particular, Article I, Section 2 of the Constitution requires that

"Representatives . . . shall be apportioned among the several States . . . according to their

respective Numbers, which shall be determined" based on the number of "persons" in

each state according to an "actual Enumeration," "in such Manner as [Congress] shall by

Law direct."  U.S. Const. art. I, § 2, cl. 3.

157.    Section 2 of the Fourteenth Amendment provides that "Representatives

shall be apportioned among the several States according to their respective numbers,

counting the *whole number of persons* in each State."  U.S. Const. amend. XIV, § 2

(emphasis added).

51

158.   "Whatever his status under the immigration laws, an alien is . . . a 'person'" for purposes of the Fourteenth Amendment.  *Plyler*, 457 U.S. at 210.  A "person" means a "human being," *Black's Law Dictionary* (11th ed. 2019), and no matter what the Trump Administration may say, undocumented immigrants are human beings. Undocumented immigrants living in the United States are among the "whole number of persons in each State," U.S. Const. amend. XIV, § 2, and thus the plain and unequivocal text requires counting undocumented immigrants in the total population base used for Congressional apportionment.

159.   The Supreme Court has definitively held that non-citizens must be included in the population base used to apportion U.S. House seats to each state.  The Court held just four years ago that "the Fourteenth Amendment calls for the apportionment of congressional districts based on total population," including non-citizens.  *Evenwel*, 136 S. Ct. at 1129; *see also id.* at 1128 ("The product of these debates was § 2 of the Fourteenth Amendment, which retained total population as the congressional apportionment base.").

160.   Other courts, including this Court, have recognized the same.  *See, e.g.*, *New York*, 351 F. Supp. 3d at 514 ("[T]he Constitution mandates that every ten years the federal government endeavor to count every single person residing in the United States, whether citizen or noncitizen, whether living here with legal status or without," and "[t]he. population count derived from that effort is used . . . to apportion Representatives among the states"); *Klutznick*, 486 F. Supp. at 576 ("The language of the Constitution is not ambiguous. It requires the counting of the 'whole number of persons' for

apportionment purposes, and while illegal aliens were not a component of the population at the time the Constitution was adopted, they are clearly 'persons.'").

161.    The Memorandum brazenly ignores this precedent and the plain text of the Constitution.  It purports to unilaterally declare that undocumented immigrants are not "persons" under the Fourteenth Amendment.  Based on that shocking and baseless assertion, the Memorandum declares it to be the explicit policy of the United States "to exclude from the apportionment base aliens who are not in a lawful immigration status." The Memorandum further directs the Secretary to provide the President with information in his Census report that excludes undocumented immigrants from the population count of each state, so as to permit the President to exclude such persons in reporting to Congress the number of each representatives to which each State is entitled, which the President will then do.

162.    By denying undocumented immigrants are "persons" and excluding them from the total population count for congressional apportionment, the Memorandum violates the plain and straightforward command of the Enumeration Clause and the Fourteenth Amendment, as well as binding Supreme Court precedent.

163.    The Memorandum further violates the Enumeration Clause and the Fourteenth Amendment by apportioning U.S. House seats among the states based on data other than the "numbers" reflecting the total population of each state as determined by the "actual Enumeration" of the Decennial Census.

164.    Defendants' violations of the Enumeration Clause and the Fourteenth Amendments will cause Plaintiffs and their members harm because it will cause New York, California, and Texas, among other states, to each receive at least one fewer seat in

the House of Representatives.  Because these states will have at least one fewer congressional district than they would otherwise, each congressional district in these states will encompass more total people than it would otherwise, diluting the vote of residents of these states, such as Plaintiffs' members.  The loss of a congressional seat will also result in fewer votes for each state in the Electoral College, reducing the political power of residents of these states.  These injuries are directly traceable to the exclusion of undocumented immigrants as a result of the Memorandum and its policy

165.    Defendants' violations of the Enumeration Clause and the Fourteenth Amendments also causes harm to Plaintiffs and their members because, as explained, some of their members are undocumented immigrants and live in communities where undocumented immigrants constitute substantial portions of the population; and Plaintiffs provide services to undocumented immigrants.  The existence of an official policy to exclude undocumented immigrants from apportionment totals will cause fewer undocumented immigrants to respond to the Census, causing numerous injuries to the communities in which undocumented immigrants live, including loss of political power and funding.

166.    There is a substantial likelihood that the requested relief will redress these injuries.  *See Dep't of Commerce*, 139 S. at 2565–66; *Utah v. Evans*, 536 U.S. 452, 464 (2002);  *U.S. House of Representatives*, 525 U.S. at 329–34.

**COUNT TWO**
**Violation of Census Act**
**(2 U.S.C. § 2a(a); 13 U.S.C. § 141)**
**(*Ultra Vires*)**

167.    Plaintiffs repeat and re-allege the previous factual and jurisdictional allegations in this complaint.

168.    Congress has required that the Secretary of Commerce "shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year, which date shall be known as the 'decennial census date.'" 13 U.S.C. § 141(a).  "The tabulation of total population by States under subsection (a) of [§ 141] *as required for the apportionment of Representatives in Congress* among the several States shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States."  *Id.* § 141(b) (emphasis added).

169.    In turn, "the President shall transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the seventeenth and each subsequent decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions."  2 U.S.C. § 2a(a).

170.    As the Supreme Court and the Census Bureau have recognized, these statutes require that persons whose "usual residence" is in the United States must be counted in the enumeration and apportionment of U.S. House seats at that "usual residence."  "[T]he first census conducted in 1790 required that persons be allocated to their place of 'usual residence," and "'usual residence' has continued to hold broad connotations" through present day.  *Franklin*, 505 U.S. at 803, 805.  The Census Bureau has confirmed that its official policy today is that "[t]he state in which a person resides and the specific location within that state is determined in accordance with the concept of

'usual residence,' which is defined by the Census Bureau as the place where a person lives and sleeps most of the time." Residence Rule, 83 Fed. Reg. at 5526.

171.    Under the Census Bureau's Residence Rule, "[c]itizens of foreign countries living in the United States" must be "[c]ounted at the U.S. residence where they live and sleep most of the time."  83 Fed. Reg. at 5533.

172.    The President's Memorandum violates 13 U.S.C. § 141(a)–(b) by requiring the Secretary of Commerce to tabulate and transmit reports to the President estimates of the total population in each State that are based on data other than the actual Enumeration of each state as determined by the decennial census, and that do not count all persons who live in the state as their "usual residence."  Specifically, the President's Memorandum violates 13 U.S.C. § 141(a)–(b) by requiring the Secretary to rely on administrative data other than the actual Enumeration of each state as determined by the decennial census, and to exclude undocumented immigrants who reside in a state as their usual residence, in tabulating the total population of each state and transmitting those total population numbers to the President.

173.    The President's Memorandum also violates 2 U.S.C. § 2a(a) and 13 U.S.C. § 141(a)–(b) by requiring the President to calculate and transmit to Congress total population figures for each state, and the apportionment of U.S. House seats among the states, based on data other than "decennial census of the population," and by using a method other than the "method of equal proportions" prescribed by Congress.  2 U.S.C. § 2a(a).  The President may use only the actual enumeration of the total population of each State as "ascertained under the . . . decennial census"—and nothing else—to calculate the whole number of persons in each State and the number of Representatives for each state.

2 U.S.C. § 2a(a).  Likewise, the "method of equal proportions" is a "rigid" formula

"provided by Congress itself" that requires use of the total population of each State as

determined based on the decennial census and no other administrative data.  *Franklin*,

505 U.S. at 2775.

174.    The President's Memorandum also violates 2 U.S.C. § 2a(a) and 13

U.S.C. § 141(a)–(b) by causing the President to transmit to Congress total population

figures for each state that do not include all persons who live in each state as their "usual

residence," and/or by causing the President to transmit to Congress a number of

Representatives for each state that is calculated by excluding persons who live in each

state as their "usual residence."  If the Secretary of Commerce transmits one set of total

population numbers to the President that *do* include undocumented immigrants who live

in the United States as their usual residence (as the Secretary must do), then the President

is required to use *that* set of total population numbers in transmitting to Congress "the

whole number of persons in each State," and "the number of Representatives to which

each State would be entitled under an apportionment of the then existing number of

Representatives by the method known as the method of equal proportions."  2 U.S.C. §

2a(a).  The number of whole of persons in each state that the President must transmit to

Congress must be that "ascertained under the . . . decennial census of the population," *id.*,

which includes all persons living in the United States as their usual residence, 13 U.S.C.

§ 141(a)–(b).  And it is "required for the apportionment of Representatives in Congress

among the several States" that the President and the Secretary use the total population

numbers tabulated for each state that include all persons who live in each state as their

usual residence.  13 U.S.C. § 141(b).

175.    Because Defendant Trump and Secretary Ross will act beyond the scope of their statutory authority in a way that causes constitutional violations, they are acting *ultra vires* pursuant to 2 U.S.C. § 2a(a) and 13 U.S.C. § 141. *See, e.g.*, *Mountain States Legal Foundation v. Bush*, 306 F. 3d. 1132, 1136 (D.C. Cir. 2002) ("[T]he Supreme Court has indicated generally that review is available to ensure that Proclamations are consistent with constitutional principles and the President has not exceeded his statutory authority."); *Chamber of Commerce of United States v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("When an executive acts *ultra vires,* courts are normally available to reestablish the limits on his authority. . . . That the executive's action here is essentially that of the President does not insulate the entire executive branch from judicial review.").

176.    The Memorandum also will result in the President and Secretary Ross failing to perform their clear legal duties to, among other things: tabulate the total populations of the States based on data from the decennial census that includes all persons who live in the United States as their usual residence; calculate the whole number of persons in each state and the number of U.S. House seats to which each seat is entitled based on data from the decennial census that includes all persons who live in the United States as their usual residence; and transmit to Congress the whole number of persons in each state and the number of U.S. House seats to which each seat is entitled based on data from the decennial census that includes all persons who live in the United States as their usual residence.

177.    Defendants' violations of 2 U.S.C. § 2a(a) and 13 U.S.C. § 141 will cause Plaintiffs and their members harm because it will cause New York, California, and Texas, among other states, to receive at least one fewer seat in the House of Representatives.

Because these states will have at least one less congressional district than they would otherwise, each congressional district in these states will encompass more total people than they would otherwise, diluting the vote of residents of these states, such as Plaintiffs' members. The loss of a congressional seat will also result in fewer votes for each state in the Electoral College, reducing the political power of residents of these states. These injuries are directly traceable to the exclusion of undocumented immigrants as a result of the Memorandum and its policy.

178.    Defendants' violations of 2 U.S.C. § 2a(a) and 13 U.S.C. § 141 also causes harm to Plaintiffs and their members because, as explained, some of their members are undocumented immigrants and live in communities where undocumented immigrants constitute portions of the population; and Plaintiffs provide services to undocumented immigrants. The existence of an official policy to exclude undocumented immigrants from apportionment totals will cause fewer undocumented immigrants to respond to the Census, causing numerous injuries to the communities in which undocumented immigrants live, including loss of political power and funding.

179.    There is a substantial likelihood that the requested relief will redress these injuries. *See Dep't of Commerce*, 139 S. Ct. at 2565-66; *Utah*, 536 U.S. at 464; *U.S. House of Representatives*, 525 U.S. at 329-34.

**COUNT THREE**
**Discrimination on the Basis of Race and National Origin**
**(Fifth and Fourteenth Amendments of the U.S. Constitution)**
**(All Plaintiffs against All Defendants)**

180.    Plaintiffs repeat and re-allege the previous factual and jurisdictional allegations in this complaint.

181.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution requires that the federal government not deny people the equal protection of its laws and prohibits the federal government from discriminating against individuals in the United States on the basis of race, ethnicity, national origin, and citizenship.  U.S. Const. amend V.

182.    The Supreme Court has affirmed the clear text of the Fifth Amendment by recognizing its constitutional protections apply to "person[s]" within the jurisdiction of the United States, and not only to citizens.  *See, e.g., Wong Wing v. United States,* 163 U.S. 228 (1896) (Field, J., concurring) ("[t]he term 'person,' used in the [F]ifth [A]mendment, is broad enough to include any and every human being within the jurisdiction of the republic"); *see also Reno v. Flores*, 507 U.S. 292, 306 (1993).

183.    The Fifth Amendment's Due Process Clause "applies to all persons within the United States, including aliens, whether their presence is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

184.    The "bedrock protections of the Fifth Amendment's Due Process Clause" are not eliminated by the "mere act of entry into the United States without documentation."  *Garza v. Hargan*, 874 F.3d 735, 737–38 (D.C. Cir. 2017) (Millett, J., concurring).

185.    The Fifth Amendment's prohibition on discrimination on the basis of race, ethnicity, national origin, and citizenship is co-extensive with the Equal Protection guarantees of the Fourteenth Amendment, which the Supreme Court has long recognized extends to undocumented immigrants.  "The Fourteenth Amendment to the Constitution is not confined to the protection of citizens . . . . [and is] universal in [its] application, to

all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886).  In more recent years, the Supreme Court has reaffirmed that "aliens whose presence in this country is unlawful . . . have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."  *Plyler*, 457 U.S. at 210.

186.    The Memorandum violates the Fifth Amendment's prohibition on discrimination in at least two distinct respects.  First, it facially targets undocumented immigrants for exclusion from the decennial enumeration, outright denying them the status of "persons" under the Constitution.  Government action denying the *personhood* of people living in the United States echoes the darkest chapters of American constitutional history.  *See Dred Scott v. Sandford*, 60 U.S. 393 (1857).

187.    Second, as with the failed scheme to include a citizenship question on the census, this latest discriminatory act is motivated by a bare desire to harm immigrant communities of color, and particularly Latinx communities, by reducing their political clout and access to federal resources.

188.    Defendant Trump and nativist members of his Administration view non-white, undocumented immigrants as a political and cultural threat.  The President, as noted *supra*, has directed particularly virulent animus at Latinx immigrants.  Defendant Trump and members of his Administration have long warned about the consequences of rising Latinx political power in the United States and the ostensible harms of undocumented immigrants to the United States.

189.    The Memorandum not only would codify the animus and discriminatory goals of Defendants, but it would result in a cascade of discriminatory effects, including, but not limited to:

a.   The loss of congressional seats and Electoral College votes in states where these groups constitute significant portions of the population and where Plaintiffs have members, including a certainly impending loss for California; a substantial risk of a loss for New York, Texas, Florida, Arizona, and Illinois; and a considerable risk of a loss for New Jersey and Georgia; and

b.   A substantial reduction in the amount of federal funds distributed to the local and state governments in which the Plaintiffs reside, which all have significant, non-white populations; and

c.   A reduction of the political influence to which these communities would receive through an accurate census count.

190.    In addition to the discriminatory effects evidence well-known and acted upon by Defendants and the direct intent evidence outlined, the haphazard process through which the Defendants promulgated this Memorandum provides strong circumstantial evidence of discriminatory intent. This evidence includes the timing of the release of the Memorandum, which coincides with dispatching of Census field operations to conduct outreach to groups the Defendant Trump has discouraged from participating with dark and racist presidential campaign statements; the bizarre procedural sequence and series of events leading up to the Memorandum; the President's repeated efforts to generate confusion surrounding and distrust of the Census process; the shallow justifications cited by the President for the memorandum; the historical background and

substantive departures from prior precedents; contemporary statements of the President and other decisionmakers; and the profound unworkability of the Memorandum.

191.   Defendants' violations of the Fifth Amendment will cause Plaintiffs and their members harm because it will cause New York, California, and Texas, among other states, to receive at least one fewer seat in the House of Representatives.  Because these states will have at least one less congressional district than they would otherwise, each congressional district in these states will encompass more total people than they would otherwise, diluting the vote of residents of these states, such as Plaintiffs' members.  The loss of a congressional seat will also result in fewer votes for each state in the Electoral College, reducing the political power of residents of these states.  These injuries are directly traceable to the exclusion of undocumented immigrants as a result of the Memorandum and its policy

192.   Defendants' violations of the Fifth Amendment also cause harm to Plaintiffs and their members because, as explained, some of their members are undocumented immigrants and live in communities where undocumented immigrants constitute portions of the population; and Plaintiffs provide services to undocumented immigrants. The existence of an official policy to exclude undocumented immigrants from apportionment totals will cause fewer undocumented immigrants to respond to the Census, causing numerous injuries to the communities in which undocumented immigrants live, including loss of political power and funding.

193.   There is a substantial likelihood that the requested relief will redress these injuries.  *See Dep't of Commerce*, 139 S. Ct. at 2565-66; *Utah*, 536 U.S. at 464; *U.S. House of Representatives*, 525 U.S. at 329-34.

**COUNT FOUR**
**Separation of Powers**
**(Article I, Section 2, Clause 3 of the Constitution,**
**as amended by the Fourteenth Amendment)**
**(All Plaintiffs against Defendant Trump)**

194.     Plaintiffs repeat and re-allege the previous factual and jurisdictional

allegations in this complaint.

195.     Article I of the U.S. Constitution, in conjunction with the Fourteenth

Amendment, requires that the federal government conduct an "actual Enumeration" of

the national population every ten years to determine the "whole number of persons" in

the United States and within each state for the purpose of apportioning members of the

House of Representatives to the respective states according to their population.  U.S.

Const. art I, § 2, cl. 3; *id.* amend. XIV, § 2.

196.     The Constitution, through the Enumeration Clause, "vests Congress with

virtually unlimited discretion in conducting the decennial 'actual Enumeration.'" *Dep't*

*of Commerce*, 139 S. Ct. at 2566 (quoting *Wisconsin v. City of New York*, 517 U.S. 1, 19

(1996)).

197.     As the Supreme Court has noted repeatedly, through the Census Act,

Congress "delegated to the *Secretary of Commerce* the tasks of conducting the decennial

census 'in such form and content as he may determine,'"—not the President.  *Id.* at 2567

(quoting 13 U.S.C. § 141(a)).

198.     The text of the Census Act itself makes clear that Congress has delegated

authority over the census to the *Commerce Secretary*, not the *President*.

199.     Section 141(a) of the Census Act requires that "*[t]he Secretary shall*, in

the year 1980 and every 10 years thereafter, take a decennial census of population as of

the first day of April of such year, which date shall be known as the 'decennial census date', *in such form and content as he may determine*"—not the President.  13 U.S.C. § 141(a) (emphasis added).

200.    Section 4 of the Census Act requires the Secretary, *not* the President, to "perform the functions and duties imposed upon him by this title."  13 U.S.C. § 4.

201.    The Census Act plainly distinguishes between the Secretary and the President in their roles regarding the Census, as intended by Congress.  *See, e.g.*, 13 U.S.C. § 141(b) ("The tabulation of total population by States under subsection (a) of this section as required for the apportionment of Representatives in Congress among the several States shall be completed within 9 months after the census date and reported *by the Secretary to the President* of the United States.") (emphasis added); 13 U.S.C. § 21 (distinguishing between "the President" and "the Secretary").

202.    The Constitution and Census Act thus make clear that the President has usurped powers Congress has delegated to the Secretary.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."); *see also Medellin v. Texas*, 552 U.S. 491, 524 (2008) ("Justice Jackson's familiar tripartite scheme provides the accepted framework for evaluating executive action in this area.").

203.    The Constitution and Census Act are unambiguous: Congress has constitutional authority over the census, and it has delegated none of that authority to the President.  The Memorandum therefore violates the Constitution's separation of powers.

204.    Defendants' constitutional violation causes ongoing harm to Plaintiffs and their members because as explained their members are undocumented immigrants and live in communities where undocumented immigrants constitute significant portions of the populations; and provide services to undocumented immigrants, and as such, these violations will deprive them of the political influence and funding to which they would be entitled by a more accurate census.

205.    The Supreme Court has stated, "An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable.  Fidelity to principles of federalism is not for the States alone to vindicate." *Bond v. United States*, 564 U.S. 211, 222 (2011).

206.    Defendants' violations of the constitutional separation of powers will cause Plaintiffs and their members harm because it will cause New York, California, and Texas, among other states, to receive at least one fewer seat in the House of Representatives.  Because these states will have at least one less congressional district than they would other, each congressional district in these states will encompass more total people than they would otherwise, diluting the vote of residents of these states, such as Plaintiffs' members.  The loss of a congressional seat will also result in fewer votes for each state in the Electoral College, reducing the political power of residents of these states.  These injuries are directly traceable to the exclusion of undocumented immigrants as a result of the Memorandum and its policy

207.    Defendants' violations of the constitutional separation of powers also causes harm to Plaintiffs and their members because, as explained, some of their

members are undocumented immigrants and live in communities where undocumented immigrants constitute significant portions of the population; and Plaintiffs provide services to undocumented immigrants.  The existence of an official policy to exclude undocumented immigrants from apportionment totals will cause fewer undocumented immigrants to respond to the Census, causing numerous injuries to the communities in which undocumented immigrants live, including loss of political power and funding.

208.    There is a substantial likelihood that the requested relief will redress these injuries.  *See Dep't of Commerce*, 139 S. Ct. at 2565-66; *Utah*, 536 U.S. at 464; *U.S. House of Representatives*, 525 U.S. at 329-34.

**COUNT FIVE**
**Administrative Procedure Act**
**(All Plaintiffs against Defendants Ross, Dillingham, Department of Commerce and Census Bureau)**

209.    Plaintiffs repeat and re-allege by reference all of the previous factual allegations in this Complaint.

210.    The Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 704, provides for a cause of action against any final agency action, within the meaning of the APA.

211.    Upon information and belief, the Department of Commerce has directed the Census Bureau to effectuate the Memorandum's policy of excluding noncitizens from the enumeration used to apportion congressional representation and has instructed the Census Bureau to that effect.  This constitutes a final agency action within the meaning of the APA because it marks the consummation of the agency's decision-making process, and it is one by which rights or obligations have been determined, or from which legal consequences will flow, *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

212.    In addition, the Secretary's tabulation of total population numbers for each state that exclude undocumented immigrants and his transmission of those numbers to the President is required under the Memorandum, and thus the fact that the Secretary will take these actions is indisputable and inevitable.  The Secretary's tabulation of total population numbers for each state that exclude undocumented immigrants and his transmission of those numbers to the President are separate final agency actions within the meaning of the APA.  Requiring Plaintiffs to challenge those mandated final actions after they occur could enable Defendants to evade judicial review.

213.    The APA, 5 U.S.C. § 706(2), provides that a court shall hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

214.    The Department of Commerce directive to the Census Bureau to effectuate the policy of excluding undocumented immigrants from the Census as set forth in the Memorandum also violates the APA because it is contrary to statutory and constitutional law.  *Dep't of Commerce*, 139 S. Ct. 2551 at 2569;  *State Farm Mut. Auto. Ins. Co*., 463 U.S. at 42-43.

215.    The Census Act requires that this decennial census result in a "tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States" to be reported to the President. 13 U.S.C. § 141(b).  This statute has identical meaning as the Constitution, whose mandate it implements: undocumented immigrants are included in the "total population" of each state, and thus must be included in the Census. The statute governing reapportionment, 2 U.S.C. § 2a, provides that after within one week of the first day of the first regular

session of each Congress following the Census – that is, after receiving the Secretary of

Commerce's report pursuant to 13 U.S.C. § 141(b) – the President shall transmit to

Congress the population of each state and the number of seats to which it is entitled in the

House of Representatives.  Like the Census Act, this statute implements the

Constitution's requirement that apportionment be based on the total population of each

state by mandating that the President's statement to Congress show "the whole number of

persons in each State . . . ." 2 U.S.C. § 2a(a).  Undocumented immigrants are included

within the "whole number of persons in each State" as used in 2 U.S.C. § 2a(a).

216.    The Department of Commerce directive to the Census Bureau to effectuate

the policy of excluding undocumented immigrants from the Census as set forth in the

Memorandum is also arbitrary and capricious in violation of the APA because: it relied

on factors which Congress has not intended it to consider; entirely failed to consider an

important aspect of the problem; and offered an explanation for its decision that runs

counter to the evidence before the agency.  *Dep't of Commerce*, 139 S. Ct. 2551 at

2569; *State Farm Mut. Auto. Ins. Co*., 463 U.S. at 42-43.

217.    The Department of Commerce directive to the Census Bureau to effectuate

the policy of excluding undocumented immigrants from the Census as set forth in the

Memorandum is also arbitrary and capricious in violation of the APA because it changed

long-standing, consistent Census Bureau policy without a "reasoned analysis of the

change."  *State Farm Mut. Auto. Ins. Co*., 463 U.S. at 42-43; *FCC v. Fox Television

Stations, Inc.*, 556 U.S. 502 (2009).

218.    The Department of Commerce directive to the Census Bureau to effectuate

the policy of excluding undocumented immigrants from the Census as set forth in the

Memorandum is also arbitrary and capricious in violation of the APA because it is the subject of improper political influence and pressure from political actors. *D.C. Fed'n of Civic Assoc. v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971); *Tummino v. Torti*, 603 F. Supp. 2d 519 (E.D.N.Y. 2009).

219.    The Memorandum further violates the APA by effectively abrogating the Residence Rule without going through notice-and-comment rulemaking.  The Census Bureau issued the Residence Rule pursuant to notice-and-comment rulemaking.  The Census Bureau provided in the Residence Rule that foreign citizens must be "[c]ounted at the U.S. residence where they live and sleep most of the time," 83 Fed. Reg. at 5533, and the Census Bureau confirmed that "[a]pportionment is based on the resident population" as calculated pursuant to the Residence Rule.  83 Fed. Reg. at 5526 n.1.  The APA's notice-and-comment requirements prohibit the Census Bureau from calculating the total population of each state in a manner different from that set forth in the Residence Rule without revising or replacing the Residence Rule pursuant to notice-and-comment rulemaking.  Neither the President nor the Secretary of Commerce may order the Census Bureau to violate a rule issued pursuant to notice-and-comment rulemaking.  "An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fox Television Stations, Inc.*, 556 U.S. 502.

220.    Defendants' violations of the APA will cause Plaintiffs and their members harm because it will cause New York, California, and Texas, among other states, to receive at least one fewer seat in the House of Representatives.  Because these states will have at least one less congressional district than they would otherwise, each congressional district in these states will encompass more total people than they would

otherwise, diluting the vote of residents of these states, such as Plaintiffs' members.  The loss of a congressional seat will also result in fewer votes for each state in the Electoral College, reducing the political power of residents of these states.  These injuries are directly traceable to the exclusion of undocumented immigrants as a result of the Memorandum and its policy.

221.    Defendants' violations of the APA also cause harm to Plaintiffs and their members because, as explained, some of their members are undocumented immigrants and live in communities where undocumented immigrants constitute significant portions of the population; and Plaintiffs provide services to undocumented immigrants. The existence of an official policy to exclude undocumented immigrants from apportionment totals will cause fewer undocumented immigrants to respond to the Census, causing numerous injuries to the communities in which undocumented immigrants live, including loss of political power and funding.

222.    There is a substantial likelihood that the requested relief will redress these injuries.  *See Dep't of Commerce*, 139 S. Ct. at 2565-66; *Utah*, 536 U.S. at 464; *U.S. House of Representatives*, 525 U.S. at 329-34.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

i.    Declare that Defendants' exclusion of undocumented immigrants from (a) the tabulation of the total population of the states; (b) the calculation and statement of the whole number of persons in each state; and (c) the calculation and statement of the apportionment of the House of Representatives among the states, is unauthorized by and violates the Constitution and laws of the United States;

ii.   Declare that Defendants' exclusion of undocumented immigrants is *ultra vires* and violates 2 U.S.C. § 2a(a) and 13 U.S.C. § 141(a)-(b);

iii.   Preliminarily and permanently enjoin Defendants and all those acting on their behalf from excluding undocumented immigrants from: (a) the tabulation of total population by states; (b) the calculation and statement of the whole number of persons in each state; and (c) the calculation and statement of the apportionment of the House of Representatives among the states;

iv.   Estop Defendants from excluding undocumented immigrants from: (a) the tabulation of total population by states; (b) the calculation and statement of the whole number of persons in each state; and (c) the calculation and statement of the apportionment of the House of Representatives among the states;

v.   Issue a writ of mandamus compelling the Secretary of Commerce to tabulate and report the total population of each state under 13 U.S.C § 141(b) based only on the actual enumeration of the total population as determined by the decennial census, including undocumented immigrants who live in the United States as their usual residence;

vi.   Issue a writ of mandamus compelling the President to calculate the whole number of persons in each state and the apportionment of the House of Representatives among the states based only on the actual enumeration of the total population as determined by the decennial census, including undocumented immigrants who live in the United States as their usual residence;

vii.  Issue a writ of mandamus compelling the President to calculate the

apportionment of the House of Representatives among the states based on the method of

equal proportions prescribed by Congress;

viii.    Award Plaintiffs their reasonable fees, costs, and expenses, including

attorneys' fees, pursuant to 28 U.S.C. § 2412; and

ix.  Award any other such additional relief as the Court deems proper.

Dated: July 24, 2020

Respectfully submitted,

/s/ Dale Ho
Adriel I. Cepeda Derieux
Davin Rosborough
Jonathan Topaz
Sophia Lin Lakin*
American Civil Liberties Union
Foundation
125 Broad St.
New York, NY 10004
(212) 549-2693
dho@aclu.org
acepedaderieux@aclu.org
drosborough@aclu.org
jtopaz@aclu.org
slakin@aclu.org

/s/ Sarah Brannon* **
Ceridwen Cherry*
American Civil Liberties Union
Foundation
915 15th Street, NW
Washington, DC 20005-2313
(202) 675-2337
sbrannon@aclu.org
ccherry@aclu.org

/s/ John A. Freedman
John A. Freedman
R. Stanton Jones*
Daniel F. Jacobson*
Chase Raines*
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C.  20001
(202) 942-5000
John.Freedman@arnoldporter.com
Stanton.Jones@arnoldporter.com
Daniel.Jacobson@arnoldporter.com
Chase.Raines@arnoldporter.com

/s/ Perry Grossman
Perry Grossman
pgrossman@nyclu.org
New York Civil Liberties Union
Foundation
125 Broad Street
New York, NY 10004
Phone: (212) 607-3329

Andre Segura*
Edgar Saldivar*

* Designates pro hac vice application
forthcoming.

** Not admitted in the District of
Columbia; practice limited pursuant to
D.C. App. R. 49(c)(3).

Thomas Buser-Clancy*
ACLU Foundation of Texas, Inc.
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-9146
Fax: (713) 942-8966
asegura@aclutx.org
esaldivar@aclutx.org
tbuser-clancy@aclutx.org