IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, *et al.*,<br><br>Defendants. | No. 20 Civ 5770 (JMF) |
| NEW YORK IMMIGRATION<br>COALITION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, *et al.*,<br><br>Defendants. | No. 20 Civ. 5781 (JMF) |

**DEFENDANTS' REPLY
IN SUPPORT OF THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iii

ARGUMENT

I.    The Court Lacks Subject Matter Jurisdiction. ...................................................................1

    A.    Plaintiffs' Claims are Unripe.........................................................................................1

    B.    Plaintiffs Lack Standing................................................................................................2

II.   Plaintiffs Fail to State a Claim. ........................................................................................4

    A.    Plaintiffs Fail to State an Apportionment Clause Claim. ..............................................4

    B.    Plaintiffs Fail to State an *Ultra Vires* or "Separation of Powers" Claim....................9

    C.    Plaintiffs' APA Claims Should Be Dismissed for Lack of "Final Agency Action"...............12

    D.    Plaintiffs' Tenth Amendment Claim Should Be Dismissed Under *Iqbal.* ...............12

    E.    Plaintiffs' Equal Protection Claims Fail the Animus Requirement..........................13

    F.    Plaintiffs' Official Capacity Claims Against the President Must Be Dismissed. ...................14

CONCLUSION.....................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
 458 U.S. 592 (1982)...........................................................................................................4

*Ashford v. Iqbal,*
 556 U.S. 662 (2009).........................................................................................................13

*Burns v. Richardson,*
 384 U.S. 73 (1966).............................................................................................................8

*Clapper v. Amnesty Int'l USA,*
 568 U.S. 398 (2013)...........................................................................................................3

*Clinton v. Jones,*
 520 U.S. 681 (1997).........................................................................................................15

*Cmty. Care Found. v. Thompson,*
 318 F.3d 219 (D.C. Cir. 2003).........................................................................................11

*Dep't of Homeland Security v. Regents of Univ. of California,*
 140 S. Ct. 1891 (2020)...............................................................................................13, 14

*Evenwel v. Abbott,*
 136 S. Ct. 1120 (2016).......................................................................................................8

*Franchise Tax Board v. Hyatt,*
 139 S. Ct. 1485 (2019).......................................................................................................7

*Franklin v. Massachusetts,*
 505 U.S. 788 (1992)...................................................................................................*passim*

*In re Methyl Tertiary Butyl Ether (MBTE) Prods. Liab. Litig.,*
 725 F.3d 65 (2d Cir. 2013).................................................................................................2

*Kaplan v. Tod,*
 267 U.S. 228 (1925)...........................................................................................................6

*Knight First Amendment Inst. at Columbia Univ. v. Trump,*
 928 F.3d 226 (2d Cir. 2019).............................................................................................15

*Lower East Side People's Credit Union v. Trump,*
 289 F. Supp. 3d 568 (S.D.N.Y 2018)................................................................................3

*Mississippi v. Johnson,*
    4 Wall 475 (1867) ......................................................................................... 14, 15

*Nat'l Org. for Marriage, Inc. v. Walsh,*
    714 F.3d 682 (2d Cir. 2013) ................................................................................ 1, 2

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ............................................................................................... 2

*New York v. U.S. Dep't of Commerce,*
    351 F. Supp. 3d 502 (S.D.N.Y. 2019) ..................................................................... 14

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ............................................................................ 15

*Nixon v. Fitzgerald,*
    457 U.S. 734 (1982) ............................................................................................. 15

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
    523 U.S. 726 (1998) ............................................................................................... 2

*Ross v. AXA Equitable Life Ins. Co.,*
    115 F. Supp. 3d 424 (S.D.N.Y. 2015) ...................................................................... 3

*Simon v. E. Kentucky Welfare Rights Org.,*
    426 U.S. 26 (1976) ................................................................................................. 4

*State of Cal. v. Dep't of Justice,*
    114 F.3d 1222 (D.C. Cir. 1997) ............................................................................ 12

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ................................................................................................. 4

*Swan v. Clinton,*
    100 F.3d (D.C. Cir. 1996) ..................................................................................... 15

*DHS v. Thuraissigiam,*
    140 S. Ct. 1959 (2020) ........................................................................................ 5, 6

*Utah v. Evans,*
    536 U.S. 452 (2002) ............................................................................................. 11

*Warth v. Seldin,*
    422 U.S. 490 (1975) ............................................................................................... 4

*Washington State Grange v. Washington State Republican Party,*
    552 U.S. 442 (2008) ............................................................................................... 7

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)...................................................................................................... 15

**Statutes**

2 U.S.C. § 2a(a)........................................................................................................... 10, 11

13 U.S.C. § 141(b)....................................................................................................... 10, 11

28 U.S.C. § 1253................................................................................................................ 15

**Regulations**

83 Fed. Reg. 5.................................................................................................................... 1

85 Fed. Reg. 44.................................................................................................................. 1

**ARGUMENT**

**I.      The Court Lacks Subject Matter Jurisdiction.**

     **A.  Plaintiffs' Claims are Unripe.**

Plaintiffs' claims, which "depend[] upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" are unripe. *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (citation omitted). Plaintiffs cannot elide this jurisdictional defect by plainly mischaracterizing the Presidential Memorandum.

The Memorandum adopts a policy that anticipates excluding illegal aliens from the apportionment base "to the extent feasible and to the maximum extent of the President's discretion under the law." 85 Fed. Reg. 44,679, 44,680 (July 21, 2020) (emphasis added). In addition to providing the number tabulated according to the methodology set forth in the Residence Criteria, 83 Fed. Reg. 5,525 (Feb. 8, 2018), the Memorandum directs the Secretary of Commerce ("Secretary") to provide the President with a second number "permitting the President, to the extent practicable," to carry out the stated policy. *Id.* Therefore, for example, if it is not feasible to exclude all illegal aliens from the apportionment base, that would still be entirely consistent with the policy stated in the Memorandum. *See* ECF No. 118 (hereinafter, "Defs.' Initial Br. __"), at 7-8. The Memorandum directs the Secretary to determine what is *feasible*. The Memorandum does not require the *impossible*. Thus, if the Secretary determines that it is not feasible to exclude illegal aliens from any count, then this would not represent a change in the course of conduct called for by the Memorandum, despite Plaintiffs' allegations. *See* ECF No. 150 (hereinafter, "Pls.' Opp. Br. __"), at 8.

And Plaintiffs cannot establish ripeness where they themselves repeatedly allege that it is not feasible for the Census Bureau to exclude all illegal aliens from the apportionment base. *See* Gov't Pls.' Am. Compl. ¶¶ 137-41, NGO Pls.' Am. Compl.¶¶ 175-79; *see also* Defs.' Initial Br. 7-8. Plaintiffs do not allege that they will suffer an apportionment injury if the President were to exclude only a

currently unknown subset of illegal aliens from the apportionment base. Plaintiffs' alleged apportionment injury therefore is speculative and unripe. *See Nat'l Org. for Marriage*, 714 F.3d at 687.

Prudential considerations and Article III standing issues (discussed below) further counsel against exercising jurisdiction. *See* Defs.' Initial Br. 8-9. Any harm to Plaintiffs is purely conjectural at this point. Further, apportionment challenges have historically been decided post-apportionment without spurring the "chaos" that Plaintiffs allege (without factual support) will occur here if the Court waits. *See* Defs.' Initial Br. 9-10; Pls.' Opp. Br. 10-11 & n.8. Plaintiffs also misunderstand the potential harm to Defendants. Pls.' Opp. Br. 11-12. At this time the Census Bureau is engaged in the process of determining the appropriate methodology for excluding illegal aliens, in accordance with the Memorandum. *See* Declaration of John M. Abowd, Ph.D., ¶15. Although premature judicial review would, like the Memorandum itself, not in any way affect the conduct of the actual census, it would inappropriately interfere with the Bureau's ongoing process by "hinder[ing] agency efforts to refine its policies" and "to apply its expertise." *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 735-36 (1998) (citation omitted). Likewise, the Court's evaluation of any claim, assuming any is legally viable, would benefit from allowing the Census Bureau, the Secretary, and the President to complete the enumeration and apportionment process. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior,* 538 U.S. 803, 812 (2003) ("Although the question presented here is 'a purely legal one' . . . we nevertheless believe that further factual development would 'significantly advance our ability to deal with the legal issues presented.'") (citation omitted).

### B. Plaintiffs Lack Standing.

Plaintiffs also do not have standing to bring their claims because their asserted "chilling effect" injuries are too speculative. Gov't Pls.' Am. Compl. ¶¶ 130, 132-34; NGO Pls.' Am. Compl. ¶¶ 9, 170-74. Plaintiffs' conclusory, hearsay, and conjectural expert and fact witness declarations are not sufficient to establish that their alleged injury is "imminent rather than conjectural or hypothetical."

2

*In re Methyl Tertiary Butyl Ether (MBTE) Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013) (internal quotation marks and citation omitted).  For example, Plaintiffs do not dispute that Dr. Barreto and Mr. Thompson relied on general social science research and research regarding a *citizenship question on the census form*—evidence that has little bearing on the issues in this case involving the Memorandum. It is one thing to credit allegations that aliens would be irrationally afraid of listing their citizenship status on a government questionnaire, but it is another thing entirely to credit the speculative theory that aliens are irrationally afraid to answer a questionnaire based on an internal government directive that lacks any practical impact on one's response to the questionnaire.  This Court should not credit implausible allegations of such a speculative, attenuated fear, which is far too slender a reed to exercise judicial power to review significant constitutional questions and Presidential action.

Plaintiffs have also failed to sufficiently allege that any diminution in census response rates is fairly traceable to the Memorandum.  *See Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 433 (S.D.N.Y. 2015) (Furman, J.), *aff'd by* 680 F. App'x 41 (2d Cir. 2017) ("no Article III standing exists if a plaintiff's theory of injury rests on an 'attenuated chain of inferences necessary to find harm'") (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)).  Plaintiffs' opposition brief does not address the fact that the alleged chilling effect injury is rooted in speculation about how aliens will respond to messages conveyed by the media and community activists about the Memorandum  (as opposed to the Memorandum itself), nor that "speculation regarding the future actions of third parties [that] is not sufficient to establish an imminent injury."  *See Clapper*, 568 U.S. at 410; *Lower East Side People's Credit Union v. Trump*, 289 F. Supp. 3d 568, 580 (S.D.N.Y 2018).  NGO Plaintiffs' allegation that they are required to divert resources as a result of the Memorandum (Pls.' Opp. Br. 4-6) similarly fails.  Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *See Clapper*, 568 U.S. at 416.

Even had Plaintiffs sufficiently alleged a non-speculative injury fairly traceable to Defendants'

conduct, Plaintiffs' opposition brief makes virtually no attempt to show that the requested prospective relief would remedy the harm.  Pls.' Opp. Br. 6; Defs.' Initial Br. 18-19; *Warth v. Seldin*, 422 U.S. 490, 508 (1975); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).  It is undisputed that even if this Court were to issue a temporary injunction, appellate review would likely last well past the end of the conduct of the census.  And critically, Plaintiffs do not and cannot plausibly allege that individuals who purportedly have been dissuaded from participating in the census because of the Memorandum—despite the lack of any rational basis to fear that the Memorandum would put them at risk for having participated in the census—would suddenly drop their irrational fears based solely on a district court order that remains subject to appellate reversal.  That failure is fatal to Plaintiffs' standing, and their complaints therefore could and should be dismissed for that reason alone.  *See, e.g., Warth*, 422 U.S. at 506 (dismissing complaint where "record is devoid of any indication that . . . were the court to remove the obstructions attributable to respondents, such relief would benefit petitioners"); *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976) (finding remedy too speculative where plaintiff merely alleged that a government policy had "encouraged" private action and that a different regulatory requirement would "discourage" the same action).

Finally, contrary to their contentions (Pls.' Opp. Br. 5), the Government Plaintiffs also do not have standing to bring this action based on the Plaintiffs' "parens patriae[] interests in the well-being of their residents."  Plaintiffs' assertion is foreclosed by established Supreme Court law, which holds that "[a] State does not have standing as parens patriae to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982).

## II.     Plaintiffs Fail to State a Claim.

### A.   Plaintiffs Fail to State an Apportionment Clause Claim.

Plaintiffs do not dispute that only the "inhabitants" (or "usual residents") of a State qualify as "persons in [that] State" under the Apportionment Clause.  *Cf.* Pls.' Opp. Br. 14.  Nor do they deny

that the Executive has some discretion to determine who qualifies as an "inhabitant" for purposes of the apportionment base. *Cf. id.* at 15-16. Accordingly, to prevail in their facial challenge to a policy excluding illegal aliens only "to the maximum extent feasible and consistent with the discretion delegated to the executive branch," 85 Fed. Reg. at 44,680, Plaintiffs must show that "inhabitants" both encompasses *all* illegal aliens and does so *unambiguously*. They cannot do either.

To start, Plaintiffs provide no explanation for how certain categories of illegal aliens could be considered "inhabitants" under *any* definition of that term. Even Plaintiffs' preferred definition of "inhabitant"—"a person who usually lives in the United States," Pls.' Opp. Br. 18 n.10—would not encompass, for example, illegal aliens residing in a detention facility after being arrested while crossing the border. Plaintiffs offer no explanation for why such aliens should be treated differently from alien tourists detained on Census Day for reasons unrelated to the manner of their entry, who they agree may be excluded from the apportionment base, *id.* at 14. Instead, Plaintiffs assert that "many" of these aliens may eventually "obtain lawful status," *id.* at 17, but that does not mean that the Executive must include *all* of them in the apportionment base *now*. *Id.* at 18 n. 10. Such aliens are in much the same position as those who wish to immigrate to the United States in the future, who no one thinks are "inhabitants" of this country. *Cf. DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020).

Plaintiffs nevertheless suggest that because the Census Bureau previously announced that it would treat such aliens as "usual residents" of the State where they are detained, the Constitution binds the President to that announcement. Pls.' Opp. Br. 14, 17. That theory is wholly untenable. Nothing in the Constitution requires the President to include in the apportionment base illegal aliens who would not qualify as "inhabitants" under *any* definition of the term merely because the Bureau counted them in conducting the census, any more than it would compel him to include alien tourists the Bureau counted. Rather, the President retains the "authority to direct the Secretary in making policy judgments that result in 'the decennial census,'" and he is not "required to adhere to the policy

decisions reflected in the Secretary's report." *Franklin v. Massachusetts*, 505 U.S. 788, 799 (1992).

Nor do Plaintiffs articulate a justification for treating as "inhabitants" aliens who have been detained for illegal entry and paroled into the country pending removal proceedings, or who are subject to final orders of removal. They dismiss as "unrelated to apportionment" (Pls.' Opp. Br. 18) authorities holding that aliens paroled into the country are not "dwelling" or "resid[ing] permanently" in the United States. *E.g.*, *Kaplan v. Tod*, 267 U.S. 228, 230 (1925); *see* Defs.' Initial Br. 35, 38-39. But Plaintiffs accept that to qualify as an "inhabitant," one must "reside[]" in the country (Pls.' Opp. Br. 13), and they fail to provide any rationale to explain why longstanding legal principles and precedents governing whether an alien "reside[s]" in the United States *must* be ignored in the apportionment context. To the contrary, the United States' sovereign prerogative is "to set the conditions for an alien's lawful entry into this country," *Thuraissigiam*, 140 S. Ct. at 1964. As the Supreme Court has explained, one "sovereign prerogative" of a self-governing nation is the "power to admit or exclude aliens," and extending that discretionary authority to the apportionment of political representation is consistent with this "fundamental proposition," *Id.* at 1982; *see also* Defs.' Initial Br. 36 n.11. This is particularly relevant to apportionment, which concerns the allocation of representation among the People—the self-governing polity—of the United States.

Plaintiffs protest that they should not have to address whether the Apportionment Clause requires the inclusion of "hypothetical subset[s]" of illegal aliens because the Memorandum requires the exclusion of "*all*" illegal aliens. Pls.' Opp. Br. 13. But, again, that overstates the facts. The Memorandum establishes a policy of excluding illegal aliens "to the maximum extent feasible and consistent with the discretion delegated to the executive branch." 85 Fed. Reg. at 44,680. It is Plaintiffs who chose to frame their claim as a *facial* challenge and to sue before the President has finally determined, based on information provided by the Secretary and the Census Bureau, which illegal aliens may be "feasible" to exclude "consistent" with his lawful discretion under *Franklin* in construing

the term "inhabitant."   Plaintiffs must live with the consequences of that decision, including the burden to show that "'no set of circumstances exists'" under which implementing the Memorandum would be valid, *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008).

In any event, Plaintiffs fail to establish that their definition of "inhabitants" is the *only* one available under the Constitution.   Plaintiffs do not dispute that a figure such as Vattel—the most influential international law author in the Founding era—provided a definition of "inhabitants" under which aliens would qualify only when given "permission" to reside in a country.[1]   Nor do they dispute that other prominent figures such as Marshall and Madison were familiar with a definition of "inhabitants" that extended only to those aliens "who have 'permission' to stay in a jurisdiction."   Pls.' Opp. Br. 18; *see* Defs.' Initial Br. 32, 38 & n.13.   Instead, they dismiss that definition as coming from "unrelated contexts."   Pls.' Opp. Br. 18 n.1.   But given that the Supreme Court when applying the Apportionment Clause has drawn on Madison's understanding of the "term 'inhabitant'" in the "context of congressional residence qualifications," *Franklin*, 505 U.S. at 805, that is a wholly inadequate justification for disregarding Madison's understanding of "inhabitants" in the context of aliens specifically.   *See The Federalist* No. 42, at 285 (Jacob E. Cooke ed., 1961).

Lacking evidence that their understanding of "inhabitants" is the only one available, Plaintiffs claim that the Fourteenth Amendment's Framers "affirmatively rejected" a definition of the apportionment base that turned on "immigration status."   Pls.' Opp. Br. 15.   That makes no sense given Plaintiffs' admission that federal laws restricting immigration were "enacted only after the Fourteenth Amendment."   *Id.*   Plaintiffs contend (*id.*) that "certain States had immigration laws" barring the entry of particular aliens prior to 1868 and that there is "no indication" that the Framers

---

[1] Plaintiffs dispute neither that Vattel was the "founding era's foremost expert on the law of nations," *Franchise Tax Board v. Hyatt*, 139 S. Ct. 1485, 1493 (2019); *see* Defs.' Initial Br. 38 & n.13, nor that the law of nations would be a natural starting place for determining whether aliens in particular are "inhabitants" for purposes of political representation.

thought those aliens should be excluded from the apportionment base, but that is beside the point. The question here is whether illegal aliens *may* be excluded, not whether they *must*. And Plaintiffs have identified no evidence showing that the Framers of the Fourteenth Amendment (or of the original Apportionment Clause) *required* future generations to allocate Congressional representation on the basis of millions of aliens who remain in the country in ongoing defiance of federal law.

Plaintiffs observe that the apportionment base has always included inhabitants "who could not vote," Pls.' Opp. Br. 18, but that too is beside the point. Instead, the point is that illegal aliens, unlike women in 1868 or children today, can reasonably be characterized as lacking an "enduring tie to," and hence a "usual residence" in, the United States—as evidenced by the fact that they can be removed from the country at any time. *Franklin*, 505 U.S. at 804. That distinction likewise disposes of Plaintiffs' reliance on *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016), which they read to hold that States may use their "total population" for "intra-state redistricting" in part because the President must use "total population" for "inter-state apportionment." Pls.' Opp. Br. 16. But the *Evenwel* plaintiffs argued that a State must exclude *all* non-voters, not illegal aliens *alone*. *Evenwel*, 136 S. Ct. at 1123. Thus, the parties in *Evenwel* did not argue, and the Supreme Court did not address, whether a State must (or may) exclude illegal aliens for purposes of intra-state redistricting, let alone whether the President may exclude them for purposes of inter-state apportionment. *Cf. Burns v. Richardson*, 384 U.S. 73, 93-94 (1966) (holding that a State could limit its population base to registered voters).

Leaving the Framers behind, Plaintiffs assert that any definition of "inhabitants" that excludes illegal aliens would be "contrary to two hundred years of census history," Pls.' Opp. Br. 18—again ignoring that there were no federal laws restricting immigration until 1875. And once more, the past practice of including illegal aliens in the apportionment base does not establish that the Executive is constitutionally compelled to do so in perpetuity. Rather, such a practice would at most show that the Executive *may* include illegal aliens within the apportionment base under the Constitution, not that

he *must*.  After all, *Franklin* upheld the Executive's decision to scuttle a nearly unbroken 180-year-old practice of not allocating federal personnel stationed overseas to the apportionment base of their home States as "consonant with, though not dictated by, the text and history of the Constitution." 505 U.S. at 806; *see id.* at 792-93.  There is no reason why the previous inclusion of illegal aliens in the apportionment base should be treated as more authoritative than the previous exclusion of overseas personnel abandoned in *Franklin*.  Contrary to Plaintiffs' suggestion (Pls.' Opp. Br. 16), nothing in *Franklin* (or in logic) supports a framework in which the Executive has the discretion to *include* individuals not physically residing in a State who still could reasonably be deemed to be "inhabitants" there, but not the discretion to *exclude* individuals physically present in a State who still could reasonably be deemed to lack status as "inhabitants" there (such as foreign diplomats).

Plaintiffs separately assert that the Memorandum violates the requirement that apportionment be based on the "'[n]umbers' from the 'actual Enumeration.'"  Pls.' Opp. Br. 12.  But this argument is identical to their statutory *ultra vires* claim and, contrary to what Plaintiffs' suggest, *see id.*, Defendants addressed it at length in explaining why those *ultra vires* claims should be dismissed.  *See* Defs.' Initial Br. 40–43.  In any event, the Constitution provides that the enumeration shall be performed "in such Manner as [Congress] shall by Law direct," U.S. Const. art. I, § 2, cl. 3, and *Franklin* makes clear that, under the statutory scheme Congress established, the President retains discretion to make his own policy determinations about what constitutes the enumeration, and is not required "to adhere to the policy decisions reflected in" the report he receives from the Secretary.  *Franklin*, 505 U.S. at 799.  In other words, it is the President's exercise of discretion and transmittal of the report to Congress that establishes the actual enumeration—and Plaintiffs have no basis to assert that a different set of numbers must, as a Constitutional matter, be used.

### B.  Plaintiffs Fail to State an *Ultra Vires* or "Separation of Powers" Claim.

Nothing in the statutory language of "total population," 13 U.S.C. § 141(b), or "whole number

of persons in each State," 2 U.S.C. § 2a(a), requires counting every person physically present on Census Day.  Defs.' Initial Br. 40–44.  By delegation of the Census Act, the Executive stands in the shoes of Congress and may properly exclude individuals from apportionment for lack of "inhabitancy" or "usual residence."  *Id.*  That is exactly what happened in every other apportionment calculated under the Census Act, and Plaintiffs do not contend otherwise.  *See* Pls.' Opp. Br. 19–22.  Instead, they seek to obfuscate this straightforward conclusion with illusory distinctions that contradict binding Supreme Court precedent.

Plaintiffs start with their desired distinction between the "actual census" (tabulated by the Secretary under the Residence Criteria) and a second set of numbers requested by the Memorandum (subtracting illegal aliens without a "usual residence" from that count, to the extent feasible and permissibly deemed within the President's discretion not to be "inhabitants").  Pls.' Opp. Br. 20–22.  Quoting Justice Stevens's separate opinion in *Franklin*, Plaintiffs protest that the Secretary's reporting of two numbers "untether[s] the actual enumeration from the apportionment" and "undermines the Census Act's purpose of ensuring an 'automatic connection' between the enumeration and apportionment."  *Id.* (quoting *Franklin*, 505 U.S. at 809 (Stevens, J., concurring in the judgment)).  But a majority of the Supreme Court specifically rejected Justice Stevens's (and Plaintiffs') view that anything in the Secretary's report must be deemed the one true "decennial census."  Because the President has substantial discretion in this area, "the 'decennial census' still presents a moving target, even *after* the Secretary reports to the President."  *Franklin*, 505 U.S. at 797 (emphasis added).  "It is not until the President submits the information to Congress that the target stops moving, because only then are the States entitled by § 2a to a particular number of Representatives."  *Id.* at 798.  So while Plaintiffs may wish that the Secretary's Residence Criteria tabulation was the "actual census,"

*Franklin* makes clear that the President has full authority to direct a different approach.  *Id.* at 799.[2]

That authority encompasses the power to request and receive information from the Secretary—and,

as we noted in our opening brief, an injunction prohibiting the Secretary from transmitting that

information would violate the Opinions Clause.  *See* Defs.' Initial Br. 42 n.17.

Plaintiffs' other perceived distinction—between "count[ing]" with exclusions and "*subtract[ing]*

persons already counted"—fares no better.  *See* Pls.' Opp. Br. 21.  Nothing in the terms "total

population," 13 U.S.C. § 141(b), or "persons in each State," 2 U.S.C. § 2a(a), requires apportionment

numbers to be obtained in a single step based only on census-questionnaire responses.  No decennial

census has ever been conducted using solely questionnaire responses, *see* Defs.' Initial Br. 42–43, nor

has one ever been a single-step process.  *See, e.g., Utah v. Evans*, 536 U.S. 452, 457–59, 473–79 (2002)

(approving the Census Bureau's use of "hot-deck imputation" to "fill[] in certain gaps in [census]

information and resolve[] certain conflicts in the data").  It makes no difference whether that multi-

step process is completed by refraining to count certain individuals upfront, or by subtracting those

same individuals from the count at the end.[3]  That was true in the very first census, and it remains true

today.  Hypothetically, Plaintiffs would have the Census Bureau exclude foreign tourists from the

enumeration if there is a foreign-tourist question on the census questionnaire, but not if foreign

tourists are first counted and then later excluded using State Department visa records.  That is absurd,

inefficient, and irreconcilable with Plaintiffs' well-established opposition to questions inquiring about

---

[2] For this reason, it does not matter that the Census Bureau established its own Residence Criteria to determine "usual residents."  That criteria does not bind the Secretary, much less the President. *Franklin*, 505 U.S. at 799; *Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996); *Cmty. Care Found. v. Thompson*, 318 F.3d 219, 227 (D.C. Cir. 2003) ("There is no authority for the proposition that a lower component of a government agency may bind the decision making of the highest level.").

[3] Although Plaintiffs concede (as they must) that it is perfectly permissible to use purported "non-census data"—like administrative records—for apportionment purposes, they quibble with using that data under their untenable addition/subtraction distinction.  Pls.' Opp. Br. 21.

legal status on the census questionnaire.  *See* Pls.' Opp. Br. 9.

### C.  Plaintiffs' APA Claims Should Be Dismissed for Lack of "Final Agency Action".

In their opposition, Plaintiffs effectively concede that they cannot identify any event that qualifies as a "final agency action" for APA purposes.  *See* Pls.' Opp. Br. 22–23.

Plaintiffs remarkably suggest that this Court can ignore this threshold defect because "if final agency action has not yet taken place, it will likely take place soon."  *Id.* at 23.  But the APA contains no such exception; instead, when there is "[n]o final administrative action," there is "no judicial review" under the APA.  *State of Cal. v. Dep't of Justice*, 114 F.3d 1222, 1225 (D.C. Cir. 1997).  Plaintiffs' APA claim should be dismissed.

### D.  Plaintiffs' Tenth Amendment Claim Should Be Dismissed Under *Iqbal*.

Plaintiffs' opposition makes clear that the crux of their Tenth Amendment claim is that the Memorandum "indirectly coerces" States to support federal immigration enforcement or somehow "violates [States'] 'equal sovereignty.'"  *See* Pls.' Opp. Br. 23–24.  Beyond quoting legal boilerplate, Plaintiffs fail to address the logical flaw that Defendants pointed out concerning this claim—namely, that even crediting Plaintiffs' allegations, the Memorandum does not operate to incentivize, reward, or pressure States to cooperate with federal immigration enforcement.  *See* Defs.' Initial Br. 22.

Specifically, as Defendants explained, even if a Plaintiff State were to start cooperating with federal immigration enforcement, the Memorandum—according to Plaintiffs—could still have a negative impact on that State's apportionment base.  *See id.*  Conversely, a Plaintiff State may continue to refuse to cooperate with federal enforcement, and the operation of the Memorandum would proceed without regard to the State's policy.  *Id.*

Plaintiffs' own submissions in this case underscore this point.  For example, according to Plaintiffs' statistics expert, Dr. Christopher Warshaw, there is a higher likelihood that a State like Texas, which has advocated for and cooperated with active federal immigration enforcement, would

"lose a seat in Congress" as result of the implementation of the Memorandum than plaintiff States like California, New Jersey, or New York.  *See* Warshaw Decl. ¶ 11 (opining that "exclusion of undocumented immigrants from the apportionment base" under Plaintiffs' interpretation of the Memorandum "will almost certainly lead Texas to lose a seat in Congress[,]" is "likely to lead California and New Jersey to lose a congressional seat[,]" and "could lead … New York … to lose [a] seat[].") (ECF No. 76-58).  In short, Plaintiffs have not alleged a factual basis for this Court to infer that the Memorandum either "indirectly coerce[s]" the plaintiff States or infringes on their "equal sovereignty." Absent such factual allegations, Plaintiffs' legal conclusions are "not entitled to the assumption of truth."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### E.  Plaintiffs' Equal Protection Claims Fail the Animus Requirement.

Under *Iqbal*, to state an equal protection claim, Plaintiffs must plausibly allege discriminatory animus.  *See* 556 U.S. at 678.  In their complaints, Plaintiffs sought to do so by mischaracterizing the Memorandum and inaccurately conflating the Memorandum's distinction between lawful and illegal aliens with racial animus.  *See* Defs.' Initial Br. at 24–25.  Plaintiffs now seek to minimize the import of the recent Supreme Court decision in *Dep't of Homeland Security v. Regents of Univ. of California*, 140 S. Ct. 1891 (2020), and to overstate the impact of the earlier citizenship question case on their equal protection claims here.  *See* Pls.' Opp. Br. 25–26.

First, contrary to Plaintiffs' assertion, *Regents* is directly applicable here for the point that Plaintiffs cannot infer animus from an alleged disparate impact.  *See id.* at 25.  As *Regents* recognized, the proposed inference proves too much—specifically, because "Latinos" constitute "a large share of the unauthorized alien population," such an inference would subject "virtually any generally applicable immigration policy … [to] challenge[] on equal protection grounds" on account of its likely "outsized" impact on the Latino community.  *See* 140 S. Ct. at 1915-16.  Instead of accepting that absurd result, *Regents* rejected the inference of animus from disparate impact in that context.  *Id.* at 1915.  The same

principle applies here, where Plaintiffs' allegations as to the "disparate impact on Latinx and Asian American[]" communities, *see* Pls.' Opp. Br. 25, are similarly insufficient to support an inference of discriminatory animus.

Second, Plaintiffs erroneously suggest that the supposed "connection between" this case "and the earlier effort to add a citizenship question to the census" can satisfy the animus requirement.  *See* Pls.' Opp. Br. 26.  The fact remains that Plaintiffs failed to prove animus in the earlier case, *see New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 671 (S.D.N.Y. 2019), and this case—involving a different decision by a different decision-maker—is not the forum for them to re-litigate that outcome.

### F.  Plaintiffs' Official Capacity Claims Against the President Must Be Dismissed.

Plaintiffs' opposition makes clear that their official capacity claims against the President seek to restrain the President's exercise of policy-making authority relating to the census and apportionment.  *See* Pls.' Opp. Br. 27–28.  But the Supreme Court has long emphasized that courts "ha[ve] no jurisdiction [] to enjoin the President in the performance of his official duties," *Mississippi v. Johnson*, 4 Wall 475, 501 (1867); *Franklin*, 505 U.S. at 802-03.

Insofar as Plaintiffs seek to avoid dismissal by erroneously positing that the injunctive relief they seek is merely "ministerial," *see* Pls.' Opp. Br. 28, that argument is foreclosed by *Franklin* and *Mississippi v. Johnson*.  Specifically, *Franklin* expressly recognized that the President's "duties" in the congressional apportionment context "*are not merely [] ministerial.*"  505 U.S. at 800 (emphasis added). *Mississippi v. Johnson*, moreover, held that a party cannot characterize the duty of a federal officer to comply with the Constitution as "ministerial" when the officer can exercise discretion in determining how to comply with the duty.  *See* 4 Wall at 498 (rejecting similar effort by Mississippi to assert an injunctive claim against President Andrew Johnson by alleging that it was "a mere ministerial duty" to stop enforcing the allegedly unconstitutional Reconstruction Acts).

Plaintiffs also cite several Supreme Court decisions that they claim to authorize their official

capacity claims against the President here.  *See* Pls.' Opp. Br. 27 & n. 13.  But the decisions cited

involve either *personal liability* claims, *see Clinton v. Jones*, 520 U.S. 681, 684 (1997); *Nixon v. Fitzgerald*,

457 U.S. at 734, or official capacity claims against cabinet officials instead of the President, *see*

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 581 (1952).

Plaintiffs' declaratory claims are no different.  As the D.C. Circuit has squarely held, "[a]

court — whether via injunctive or declaratory relief — does not sit in judgment of a President's

executive decisions." *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010) (citing *Mississippi*, 71

U.S. at 499); *see also Swan v. Clinton*, 100 F.3d at 973, 978 (D.C. Cir. 1996).  And Defendants have not

conceded otherwise.  *See* Defs.' Initial Br. at 45.  The Second Circuit case identified, *Knight First*

*Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019), did not expressly consider

whether such claims are available against the President, because the government did not raise that

issue on appeal. *Id.* 234–40.  Moreover, given that decisions of this tribunal are directly appealable

to the Supreme Court, *see* 28 U.S.C. § 1253, it is the logic of *Franklin* and the other Supreme Court

cases that controls.

As explained in our opening brief, Defs.' Initial Br. at 45, *Franklin* held that the separation of

powers principle and the unique role of the President mean that, at a minimum, an "express

statement by Congress" is required for relief against the President performing his official duties.

*Franklin*, 505 U.S. at 800–01.  Plaintiffs have no response to this point, and identify no clear

statement that would authorize declaratory or injunctive relief here.  *See* Pls.' Opp. Br. 27–28.

Accordingly, their claims against the President should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion and dismiss these

consolidated actions.

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

DAVID MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

DIANE KELLEHER
BRAD P. ROSENBERG
Assistant Branch Directors

  /s/ *Daniel D. Mauler*
DANIEL D. MAULER (VA Bar No. 73190)
ELLIOTT M. DAVIS (NY Reg. No. 4596755)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
Phone: (202) 616-0773
Fax:  (202) 616-8470
E-mail: dan.mauler@usdoj.gov

*Counsel for Defendants*