USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Jan 13 2021

(Slip Opinion)                Cite as:  592 U. S. ____ (2020)                1

Per Curiam

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–366

_____

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., APPELLANTS *v.* NEW YORK, ET AL.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

[December 18, 2020]

PER CURIAM.

Every ten years, the Nation undertakes an "Enumeration" of its population "in such Manner" as Congress "shall by Law direct."  U. S. Const., Art. I, §2, cl. 3.  This census plays a critical role in apportioning Members of the House of Representatives among the States, allocating federal funds to the States, providing information for intrastate redistricting, and supplying data for numerous initiatives conducted by governmental entities, businesses, and academic researchers.  *Department of Commerce* v. *New York*, 588 U. S. ___, ___ (2019) (slip op., at 2).

Congress has given both the Secretary of Commerce and the President functions to perform in the enumeration and apportionment process.  The Secretary must "take a decennial census of population . . . in such form and content as he may determine," 13 U. S. C. §141(a), and then must report to the President "[t]he tabulation of total population by States" under the census "as required for the apportionment," §141(b).  The President in turn must transmit to

Per Curiam

Congress a "statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained" under the census. 46 Stat. 26, 2 U. S. C. §2a(a). In that statement, the President must apply a mathematical formula called the "method of equal proportions" to the population counts in order to calculate the number of House seats for each State. *Ibid.*; see *Department of Commerce* v. *Montana*, 503 U. S. 442, 451–452 (1992).

This past July, the President issued a memorandum to the Secretary respecting the apportionment following the 2020 census. The memorandum announced a policy of excluding "from the apportionment base aliens who are not in a lawful immigration status." 85 Fed. Reg. 44680 (2020). To facilitate implementation "to the maximum extent feasible and consistent with the discretion delegated to the executive branch," the President ordered the Secretary, in preparing his §141(b) report, "to provide information permitting the President, to the extent practicable, to exercise the President's discretion to carry out the policy." *Ibid.* The President directed the Secretary to include such information in addition to a tabulation of population according to the criteria promulgated by the Census Bureau for counting each State's residents. *Ibid.*; see 83 Fed. Reg. 5525 (2018).

This case arises from one of several challenges to the memorandum brought by various States, local governments, organizations, and individuals. A three-judge District Court held that the plaintiffs, appellees here, had standing to proceed in federal court because the memorandum was chilling aliens and their families from responding to the census, thereby degrading the quality of census data used to allocate federal funds and forcing some plaintiffs to divert resources to combat the chilling effect. ___ F. Supp. 3d ___, ___–___, 2020 WL 5422959, *13–*15 (SDNY, Sept. 10, 2020) (*per curiam*). According to the District Court, the memorandum violates §141(b) by ordering

the Secretary to produce two sets of numbers—a valid tabulation derived from the census, and an invalid tabulation excluding aliens based on administrative records outside the census. *Id.,* at \_\_\_, 2020 WL 5422959, \*27. The District Court also ruled that the exclusion of aliens on the basis of legal status would contravene the requirement in §2a(a) that the President state the "whole number of persons in each State" for purposes of apportionment. *Id.,* at \_\_\_, 2020 WL 5422959, \*32. The District Court declared the memorandum unlawful and enjoined the Secretary from including the information needed to implement the memorandum in his §141(b) report to the President. *Id.,* at \_\_\_, 2020 WL 5422959, \*35. The Government appealed, and we postponed consideration of our jurisdiction. 592 U. S. \_\_\_ (2020).

A foundational principle of Article III is that "an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC* v. *Nike, Inc.*, 568 U. S. 85, 90–91 (2013) (internal quotation marks omitted). As the plaintiffs concede, any chilling effect from the memorandum dissipated upon the conclusion of the census response period. The plaintiffs now seek to substitute an alternative theory of a "legally cognizable injury" premised on the threatened impact of an unlawful apportionment on congressional representation and federal funding. *Id.,* at 100. As the case comes to us, however, we conclude that it does not—at this time—present a dispute "appropriately resolved through the judicial process." *Susan B. Anthony List* v. *Driehaus*, 573 U. S. 149, 157 (2014) (internal quotation marks omitted).

Two related doctrines of justiciability—each originating in the case-or-controversy requirement of Article III— underlie this determination. See *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 352 (2006). First, a plaintiff must demonstrate standing, including "an injury that is concrete,

Per Curiam

particularized, and imminent rather than conjectural or hypothetical." *Carney* v. *Adams*, *ante*, at 6 (internal quotation marks omitted). Second, the case must be "ripe"—not dependent on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas* v. *United States*, 523 U. S. 296, 300 (1998) (internal quotation marks omitted).

At present, this case is riddled with contingencies and speculation that impede judicial review. The President, to be sure, has made clear his desire to exclude aliens without lawful status from the apportionment base. But the President qualified his directive by providing that the Secretary should gather information "to the extent practicable" and that aliens should be excluded "to the extent feasible." 85 Fed. Reg. 44680. Any prediction how the Executive Branch might eventually implement this general statement of policy is "no more than conjecture" at this time. *Los Angeles* v. *Lyons*, 461 U. S. 95, 108 (1983).

To begin with, the policy may not prove feasible to implement in any manner whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here. Pre-apportionment litigation always "presents a moving target" because the Secretary may make (and the President may direct) changes to the census up until the President transmits his statement to the House. *Franklin* v. *Massachusetts*, 505 U. S. 788, 797–798 (1992). And as the Government recognizes, Tr. of Oral Arg. 39, any such changes must comply with the constitutional requirement of an "actual Enumeration" of the persons in each State, as opposed to a conjectural estimate. See *Utah* v. *Evans*, 536 U. S. 452, 475–476 (2002); see also 13 U. S. C. §195. Here the record is silent on which (and how many) aliens have administrative records that would allow the Secretary to avoid impermissible estimation, and whether the Census Bureau can even match the records in its possession to census data in a timely manner. See Reply Brief 4–5. Uncertainty likewise

Per Curiam

pervades which (and how many) aliens the President will exclude from the census if the Secretary manages to gather and match suitable administrative records. We simply do not know whether and to what extent the President might direct the Secretary to "reform the census" to implement his general policy with respect to apportionment. *Franklin*, 505 U. S., at 798.

While the plaintiffs agree that the dispute will take a more concrete shape once the Secretary delivers his report under §141(b), Tr. of Oral Arg. 64, 75, they insist that the record already establishes a "substantial risk" of reduced representation and federal resources, *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398, 414, n. 5 (2013). That conclusion, however, involves a significant degree of guesswork. Unlike other pre-apportionment challenges, the Secretary has not altered census operations in a concrete manner that will predictably change the count. See, *e.g., Department of Commerce* v. *New York*, 588 U. S., at ___ (slip op., at 10); *Department of Commerce* v. *United States House of Representatives*, 525 U. S. 316, 331–332 (1999). The count here is complete; the present dispute involves the apportionment process, which remains at a preliminary stage. The Government's eventual action will reflect both legal and practical constraints, making any prediction about future injury just that—a prediction.

Everyone agrees by now that the Government cannot feasibly implement the memorandum by excluding the estimated 10.5 million aliens without lawful status. Tr. of Oral Arg. 20, 63–64. Yet the only evidence speaking to the predicted change in apportionment unrealistically assumes that the President will exclude the entire undocumented population. App. 344, Decl. of Christopher Warshaw ¶11. Nothing in the record addresses the consequences of a partial implementation of the memorandum, much less supports the dissent's speculation that excluding aliens in ICE detention will impact interstate apportionment. *Post*, at 5–

Per Curiam

6, 9 (opinion of BREYER, J.); see Reply Brief 6.

The impact on funding is no more certain. According to the Government, federal funds are tied to data derived from the census, but not necessarily to the apportionment counts addressed by the memorandum. Brief for Appellants 19–20. Under that view, changes to the Secretary's §141(b) report or to the President's §2a(a) statement will not inexorably have the direct effect on downstream access to funds or other resources predicted by the dissent. *Post*, at 6–7. How that question will be addressed by the Secretary and the President is yet another fundamental uncertainty impeding proper judicial consideration at this time.

The remedy crafted by the District Court underscores the contingent nature of the plaintiffs' injuries. Its injunction prohibits the Secretary from informing the President in his §141(b) report of the number of aliens without lawful status. In addition to implicating the President's authority under the Opinions Clause, U. S. Const., Art. II, §2, cl. 1, the injunction reveals that the source of any injury to the plaintiffs is the action that the Secretary or President *might* take in the future to exclude unspecified individuals from the apportionment base—not the policy itself "in the abstract," *Summers* v. *Earth Island Institute*, 555 U. S. 488, 494 (2009). Letting the Executive Branch's decisionmaking process run its course not only brings "more manageable proportions" to the scope of the parties' dispute, *Lujan* v. *National Wildlife Federation*, 497 U. S. 871, 891 (1990), but also "ensures that we act *as judges*, and do not engage in policymaking properly left to elected representatives," *Hollingsworth* v. *Perry*, 570 U. S. 693, 700 (2013). And in the meantime the plaintiffs suffer no concrete harm from the challenged policy itself, which does not require them "to do anything or to refrain from doing anything." *Ohio Forestry Assn., Inc.* v. *Sierra Club*, 523 U. S. 726, 733 (1998).

At the end of the day, the standing and ripeness inquiries both lead to the conclusion that judicial resolution of this

Cite as:  592 U. S. ____ (2020)      7

Per Curiam

dispute is premature.  Consistent with our determination that standing has not been shown and that the case is not ripe, we express no view on the merits of the constitutional and related statutory claims presented.  We hold only that they are not suitable for adjudication at this time.

The judgment of the District Court is vacated, and the case is remanded with instructions to dismiss for lack of jurisdiction.

*It is so ordered.*

Cite as: 592 U. S. ____ (2020)          1

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–366

_____

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., APPELLANTS *v.* NEW YORK, ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

[December 18, 2020]

JUSTICE BREYER, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

The Constitution specifies that the number of Representatives afforded to each State is based on an apportionment of the total population, with each State receiving its proportional share. The Government has announced a policy to exclude aliens without lawful status from the apportionment base for the decennial census. The Government does not deny that, if carried out, the policy will harm the plaintiffs. Nor does it deny that it will implement that policy imminently (to the extent it is able to do so). Under a straightforward application of our precedents, the plaintiffs have standing to sue. The question is ripe for resolution. And, in my view, the plaintiffs should also prevail on the merits. The plain meaning of the governing statutes, decades of historical practice, and uniform interpretations from all three branches of Government demonstrate that aliens without lawful status cannot be excluded from the decennial census solely on account of that status. The Government's effort to remove them from the apportionment base is unlawful, and I believe this Court should say so.

The Court disagrees. It argues that it is now uncertain just how fully the Secretary will implement the Presidential memorandum. In my view, that uncertainty does not

2                    TRUMP *v.* NEW YORK

BREYER, J., dissenting

warrant our waiting to decide the merits of the plaintiffs'
claim.  It is true that challenges to apportionment have of-
ten come *after* the President has transmitted his tabulation
to the House.  See Brief for United States 16 (deeming as
preferable "this Court's normal approach: to decide such
cases post-apportionment" (citing *Utah* v. *Evans*, 536 U. S.
452, 458–459 (2002), *Wisconsin* v. *City of New York*, 517
U. S. 1, 10–11 (1996), and *Franklin* v. *Massachusetts*, 505
U. S. 788, 790–791 (1992))).  The Government asked us to
take that approach here.  See Tr. of Oral Arg. 7–8.  But we
have also reached and resolved controversies concerning
the decennial census based on a substantial risk of an an-
ticipated apportionment harm.  See *Department of Com-
merce* v. *United States House of Representatives*, 525 U. S.
316, 332 (1999) (holding that it is "not necessary for this
Court to wait until the census has been conducted to con-
sider" government conduct that may affect apportionment).
And that is what I believe the Court should do here.  Wait-
ing to adjudicate plaintiffs' claims until *after* the President
submits his tabulation to Congress, as the Court seems to
prefer, *ante,* at 4, risks needless and costly delays in appor-
tionment.  Because there is a "substantial likelihood that
the [plaintiffs'] requested relief . . . .will redress the alleged
injury," *United States House of Representatives*, 525 U. S.,
at 332, I would find that we can reach plaintiffs' challenge
now, and affirm the lower court's holding.

I

   The Court reasons that "standing has not been shown"
because it is too soon to tell if the Government will act "in a
manner substantially likely to harm any of the plaintiffs
here." *Ante,* at 4, 7.  As I have said, I believe to the contrary.
Plaintiffs have alleged a justiciable controversy, and that
controversy is ripe for resolution.

## A

Begin with the threatened injury. The plaintiffs allege two forms of future injury: a loss of representation in the apportionment count and decreased federal funding tied to the census totals. For an injury to satisfy Article III, it "must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List* v. *Driehaus*, 573 U. S. 149, 157 (2014) (quoting *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992); internal quotation marks omitted). We have long said that when plaintiffs "demonstrate a realistic danger of sustaining a direct injury as a result of [a policy's] operation or enforcement," they need "'not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.'" *Babbitt* v. *Farm Workers*, 442 U. S. 289, 298 (1979) (quoting *Pennsylvania* v. *West Virginia*, 262 U. S. 553, 593 (1923)).

Here, inquiry into the threatened injury is unusually straightforward. The harm is clear on the face of the policy. The title of the Presidential memorandum reads: "Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census." 85 Fed. Reg. 44679 (2020) (Presidential memorandum). That memorandum announces "the policy of the United States [shall be] to exclude from the apportionment base aliens who are not in a lawful immigration status . . . to the maximum extent feasible and consistent with the discretion delegated to the executive branch." *Id.,* at 44680. Notwithstanding the "contingencies and speculation" that "riddl[e]" this case, *ante,* at 4 (opinion of the Court), the Government has not backed away from its stated aim to exclude aliens without lawful status from apportionment. See Brief for United States 14 (urging that the Secretary "be allowed to implement the Memorandum, at which point suit can be brought"); see also *Virginia* v. *American Booksellers Assn., Inc.*, 484 U. S. 383, 393 (1988) (finding standing where "plaintiffs have alleged an actual

4                       TRUMP *v.* NEW YORK

BREYER, J., dissenting

and well-founded fear that the law will be enforced" and the
Government "has not suggested that the newly enacted
[policy] will not be enforced"). The memorandum also an-
nounces the reason for this policy: to diminish the "political
influence" and "congressional representation" of States
"home to" unauthorized immigrants. 85 Fed. Reg. 44680.
It notes that "one State"—now known to be California, see
Brief for Appellees State of New York et al. 7—is "home to
more than 2.2 million illegal aliens," and excluding such in-
dividuals from apportionment "could result in the allocation
of two or three [fewer] congressional seats than would oth-
erwise be allocated." 85 Fed. Reg. 44680. Other conse-
quences will flow from this attempt to alter apportionment.
We have previously noted that "the States use the results
in drawing intrastate political districts," and "[t]he Federal
Government [also] considers census data in dispensing
funds through federal programs to the States." *Wisconsin*
v. *City of New York*, 517 U. S. 1, 5–6 (1996).

    The implementation of the memorandum will therefore
bring about the very "representational and funding inju-
ries" that the plaintiffs seek to avoid. Brief for Appellees
State of New York et al. 10.

                               B

    Given the clarity of the Presidential memorandum, it is
unsurprising the Government does not contest that plain-
tiffs have alleged a threatened injury. Rather, it contends
that both the alleged representational and funding injuries
remain "too speculative" to satisfy Article III's ripeness re-
quirement prior to the President's actual enumeration.
Brief for United States 19. That is because—although the
Secretary's report to the President is due in just two
weeks—the Bureau's plan to implement the memorandum
remains uncertain and "depends on various unknowable
contingencies about the data," and until "later in December
or January, the Bureau cannot predict or even estimate the

Breyer, J., dissenting

results." Reply Brief for United States 4.  The Government
contends that given these uncertainties, "it is far from a
'virtual certainty' that any appellee will 'lose a [House] seat'
when the Memorandum is implemented."  *Id.,* at 5.  It also
says it is "too speculative" that plaintiffs will be dispropor-
tionately deprived of federal funding, as it is not yet certain
that the tabulation the President submits to Congress for
apportionment purposes will also be used as the total pop-
ulation for federal statutes that apportion funds on the ba-
sis of States' proportional population.  Brief for United
States 19–20.  At root, the Government contends that "ripe-
ness principles support deferring judicial review of the
Memorandum until it is implemented."  *Id.,* at 21.

   Whether viewed as a question of standing or ripeness, the
Government's arguments are insufficient.  We have said
that plaintiffs need not "demonstrate that it is literally cer-
tain that the harms they identify will come about" to estab-
lish standing.  *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398,
414, n. 5 (2013).  Rather, an "allegation of future injury may
suffice if the threatened injury is 'certainly impending,' or
there is a "'"substantial risk"'" that the harm will occur.'"
*Driehaus*, 573 U. S., at 158 (quoting *Clapper*, 568 U. S., at
414, n. 5).  Looking to the facts here, the memorandum pre-
sents the "substantial risk" that our precedents require.

   The Government's current plans suggest it will be able to
exclude a significant number of people under its policy.  To
start, even a few weeks out, the Government still does not
disclaim its intent to carry out the policy to the full extent
it can do so.  See Tr. of Oral Arg. 9–10 (stating that "we
don't know what's feasible, about excluding all illegal al-
iens," but recognizing that "some subsets are going to be
much stronger cases for the exercise of [the President's] dis-
cretion than other subsets").  Indeed, the Bureau is commit-
ted to excluding as many people as possible even if it must
act beyond the December 31 statutory deadline to do so.  *Id.,*
at 6–7.  And there is a "substantial risk" that it will be able

to do so to the point that it causes significant harm.  Both here and in related litigation below, the Government has said that as of early December, it was already feasible to exclude aliens without lawful status housed in ICE detention centers on census day, a "category [that] is likely in the tens of thousands, spread out over multiple States."  Reply Brief for United States 6; see also Brief for Appellees New York Immigration Coalition et al. 15 (citing a prior Government estimate that doing so will exclude approximately "50,000 ICE detainees").  Beyond these detainees, appellees note that the Government has also identified at least several million more aliens without lawful status that it can "individually identify" and seek to exclude from the tabulation.  *Id.,* at 15–16.  We have been told the Bureau is "working very hard to try to report on" (and exclude from the apportionment tabulation) a large number of aliens without lawful status, including "almost 200,000 persons who are subject to final orders of removal," "700,000 DACA recipients," and about "3.2 million non-detained individuals in removal proceedings."  Tr. of Oral Arg. 28–29.  All told, the Bureau already possesses the administrative records necessary to exclude at least four to five million aliens.  *Id.,* at 29.  Those figures are certainly large enough to affect apportionment.

Of equal importance, plaintiffs argue that aside from apportionment itself, the exclusion of aliens without lawful status from the apportionment count will also negatively affect federal funding that is based on per-State proportional decennial population totals.  Brief for Appellees New York Immigration Coalition et al. 18–19; see also *Department of Commerce* v. *New York*, 588 U. S. ___, ___ – ___ (2019) (slip op., at 9–10) (noting that even a small undercount of noncitizen households can lead those States to "lose out on federal funds that are distributed on the basis of state population").  Indeed, a number of federal statutes re-

BREYER, J., dissenting

quire that funding be allocated based on the results "certified," 16 U. S. C. §669c(c)(3), "stated," 49 U. S. C. §47114(d)(1)(B), or "reported," 52 U. S. C. §20901(d)(4), by the decennial census. These phrases seem always to have been understood to refer to the apportionment tabulation reported to the President by the Secretary of Commerce (the report here at issue), because that is the only tabulation that the law requires to be "certified" or "reported" as part of the decennial census. See 16 U. S. C. §669c(c)(3); 52 U. S. C. §20901(d)(4). See generally Brief for Professor Andrew Reamer, Ph. D. as *Amicus Curiae* 2–3. The Government counters that appellees have not identified any reason why the individuals unlawfully removed from the tabulation could not be *added back in* for purposes of applying funding statutes. Reply Brief for United States 7. But there is no indication that the Secretary could or would do any such thing—unless of course a court holds that the removal was unlawful. And the possibility of adding back those who have otherwise been unlawfully removed from the count does not undercut a plaintiff's standing to pursue a claim of unlawfulness in the first instance.

Moreover, the statute says that "the President shall transmit to the Congress a statement showing the whole number of persons in each State . . . *as ascertained under the* . . . decennial census of the population." 2 U. S. C. §2a(a) (emphasis added). Statute after statute pegs its funding to a State's share of "the total . . . population of all the States as determined by the last preceding decennial census." See, *e.g.,* 7 U. S. C. §361c(c)(2) (allocating funding by a State's share of "the total rural [and farm] population of all" States); §2663(b)(4) (same); 49 U. S. C. §5305(d)(1)(A)(i) (for State share of "population of urbanized areas"); §5311(c)(3)(B)(iii) (for State share of "the population of all rural areas"); see also U. S. Census Bureau, L. Blumerman & P. Vidal, Uses of Population and Income Statistics in Federal Funds Distribution—With a Focus on

Census Bureau Data 18 (2009) (estimating that as of 2009 at least 24 federal programs automatically distributed at least $10 billion in annual funding to States keyed directly to the decennial census's State population figures).  Given the connection between the decennial census and funding allocation, a change of a few thousand people in a State's enumeration can affect its share of federal resources.

I do not agree with the Court that the lingering uncertainty over the Government's plans renders this litigation unripe, nor that the apportionment process is at a "preliminary stage."  *Ante,* at 5.  For one thing, the Government has spent over a year collecting the administrative records that will be used to fulfill the Presidential memorandum.  See Exec. Order No. 13880, 84 Fed. Reg. 33823 (2019) (calling for federal departments to share administrative records so the Department of Commerce can "generate a more reliable count of the unauthorized alien population in the country . . . [and] an estimate of the aggregate number of aliens unlawfully present in each State").  For another, the Government has told us in related litigation that further delays in proceeding with apportionment beyond the statutory deadline would harm "the ability to meet contingent redistricting deadlines" in the States, because "'delays would mean deadlines that are established in state constitutions or statutes will be impossible to meet.'"  See Reply Brief in Support of Application for Stay Pending Appeal in *Ross* v. *National Urban League,* O.T. 2020, No. 20A62, p. 11.  Acting on that concern, we granted the Government's stay pending appeal so as to hasten the Government's efforts ahead of these deadlines.  See *Ross* v. *National Urban League,* 592 U. S. ___ (2020).  Presumably, waiting to resolve this issue until after the President submits his tabulation will cause further hardship by delaying redistricting further.  States will begin to consider the consequences of reapportionment soon.  See, *e.g.,* Del. Code Ann., Tit. 29, §805 (2020) ("After the official reporting of the 2020 federal

Breyer, J., dissenting

decennial census by the President to Congress . . . the General Assembly shall, not later than June 30, 2021, reapportion and redistrict the State . . . for the general election of 2022"). It is of course possible that the Bureau will be unable to find a significant number of matches between the millions of records it has and the census data it is producing in time for the President to exclude them from his tabulation submitted to Congress. But even if the Secretary were to limit severely his compliance with the President's memorandum—say, by choosing to "report" only those 50,000 aliens that are estimated to be in ICE detention centers and omitting them from his census "tabulation"—that omission alone presents a "substantial risk" of affecting the census calculation for purposes of apportionment and funding. That is the very kind of injury of which plaintiffs complain. Taken together, these considerations demonstrate that now is the appropriate time to resolve this case. Cf. *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 149 (1967) (HARLAN, J. for the Court) (explaining that the timing of judicial review turns on "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration").

To repeat, the President's stated goal is to reduce the number of Representatives apportioned to the States that are home to a disproportionate number of aliens without lawful status. The Government has confirmed that it can identify millions of these people through administrative records. But if the Census Bureau fails to fulfill its mandate to exclude aliens without lawful status and reduce the number of Representatives to which certain States are entitled, it will be for reasons not in the record. Where, as here, the Government acknowledges it is working to achieve an allegedly illegal goal, this Court should not decline to resolve the case simply because the Government speculates that it might not fully succeed.

10                    TRUMP *v.* NEW YORK

For these reasons, I believe that the plaintiffs have alleged a "substantial risk" that unlawfully subtracting aliens without lawful status from the tabulation of the total population that the President submits to Congress will inflict both apportionment and appropriations injuries on them. Those injuries are substantially likely to occur in the reasonably near future. This case squarely presents a concrete dispute and we should resolve it now.

II

On the merits, I agree with the three lower courts that have decided the issue, and I would hold the Government's policy unlawful. See *New York* v. *Trump*, ___ F. Supp. 3d. ___, ___ (SDNY, Sept. 10, 2020) (*per curiam*) (Juris. Statement 83a–94a); *San Jose* v. *Trump*, ___ F. Supp. 3d ___, ___ – ___ (ND Cal., Oct. 22, 2020) (slip op., at 72–85); *Useche* v. *Trump*, No. 8:20–cv–02225 (D Md., Nov. 6, 2020) (slip op., at 21–30). Once again, the memorandum calls for "the exclusion of illegal aliens from the apportionment base" that will be used for the "reapportionment of Representatives following the 2020 census," and orders the Secretary of Commerce to transmit information permitting the President to carry out that policy. 85 Fed. Reg. 44680. The plaintiffs challenge that policy on both constitutional and statutory grounds, arguing that it contravenes the directives to report the "tabulation of total population by States . . . as required for the apportionment," 13 U. S. C. §141(b), and to include the "whole number of persons in each State, excluding Indians not taxed." U. S. Const., Amdt. 14, §2; 2 U. S. C. §2a(a). Consistent with this Court's usual practice, I would avoid the constitutional dispute and resolve this case on the statutory question alone.

While that statutory question is important, it is not difficult. Our tools of statutory construction all point to "usual residence" as the primary touchstone for enumeration in the decennial census. The concept of residency does not

turn, and has never turned, solely on a person's immigration status. The memorandum therefore violates Congress' clear command to count every person residing in the country, and should be set aside.

## A

*First*, we have the text. The modern apportionment scheme dates back to 1929. See 46 Stat. 21 (1929 Act). The relevant language provides that the apportionment base shall include "the whole number of persons in each State" "as ascertained under the . . . decennial census." §22, *id.*, at 26 (codified at 2 U. S. C. §2a(a)); see 13 U. S. C. §141(b) (requiring the Secretary to transmit the "tabulation of *total population* by States" as required for apportionment (emphasis added)). The usual meaning of "persons," of course, includes aliens without lawful status. This Court has said as much, and the Government does not argue otherwise. See *Plyler* v. *Doe*, 457 U. S. 202, 211 (1982). Similarly, the plain meaning of the phrase "in each State," both in 1929 and now, does not turn on immigration status. Rather, as we explained in *Franklin*, that phrase has always been understood to connote some idea of "usual residence," picking up a person who is an "'inhabitant'" of the State. 505 U. S., at 804–805; see also *Wesberry* v. *Sanders*, 376 U. S. 1, 13 (1964). Neither "resident" nor "inhabitant" takes account of whether someone is lawfully, as opposed to unlawfully, present. See "Inhabitant," Webster's New International Dictionary 1109 (1927) ("One who dwells or resides permanently in a place"); "Resident," *id.*, at 1814 ("One who resides in a place; one who dwells in a place for a period of more or less duration").

Moreover, the statute (like the Constitution) explicitly excludes only one category of persons from the apportionment, "Indians not taxed," 2 U. S. C. §2a(a), though it is evident they "reside" within the United States. Congress clearly knew how to exclude a certain population that would

otherwise meet the traditional residency requirement when it wished to do so.  Yet it did not single out aliens without lawful status in the 1929 Act.

*Second*, historical practice leaves little doubt about the statute's meaning.  From the founding era until now, enumeration in the decennial census has always been concerned with residency, not immigration status.  The very first Act setting forth the decennial census procedure stated that persons should be counted if they "'usually resid[e] in the United States.'"  *Franklin*, 505 U. S., at 804 (citing Act of Mar. 1, 1790, ch. 2, §5, 1 Stat. 103).  The 1820 decennial census included "foreigners not nationalized" among the schedule of whole number of persons to be tabulated within each State.  See Act of March 14, 1820, 3 Stat. 550.  The 1860 census included escaped slaves living in the North, although those persons were unlawfully present at that time.  See *San Jose*, ___ F. Supp. 3d., at ___, 2020 WL 6253433, *7 (citing Record in No. 5:20–cv–5167, ECF No. 64–22, pp. 5–7 (Decl. of Shannon D. Lankenau)).  The 1920 census population count included a minor who had been denied lawful admission to the United States, but who was nonetheless paroled within the country during World War I until she could be sent home.  See Record in No. 20–cv–5770, Doc. 149–2, Exh. 61, ¶3 (Decl. of Jennifer Mendelsohn) (discussing the inclusion of the minor petitioner in *Kaplan* v. *Tod*, 267 U. S. 228 (1925), in the census count).  All told, at the time Congress wrote the 1929 Act, the United States had conducted more than a dozen decennial censuses.  As the Government acknowledged below, none of them excluded residents solely because of immigration status.  Juris. Statement 91a.  Any contemporary understanding of the words "persons in each State" as ascertained under the "decennial census" would have reflected this longstanding and uniform practice.  See *McQuiggin* v. *Perkins*, 569 U. S. 383, 398, n. 3 (2013) ("Congress legislates against the backdrop of existing law").  Taken together, the

BREYER, J., dissenting

history is clear as to the statute's reach; it includes the people who reside here, lawful status or not.

*Third*, the records from the legislative debate confirm that Congress was aware that the words of the statute bore this meaning.  By 1929, federal immigration laws had been on the books for more than four decades, if not longer.  See *Kleindienst* v. *Mandel*, 408 U. S. 753, 761 (1972).  Some state laws for apportioning representatives explicitly excluded aliens, aware that an apportionment based simply on "the whole number of persons" under the federal decennial census would otherwise include them.  See 71 Cong. Rec. 1977 (1929) (discussing a New York state statute that defined the apportionment base to include the number of "inhabitants, excluding aliens").  Time and again throughout the debate over what became the 1929 Act, members considered (and rejected) proposals that would have excluded aliens from the apportionment base.  See, *e.g.*, *id.*, at 2065–2068, 2360, 2451–2455.  The debates evince a shared understanding that without such an amendment, the Act would include those "aliens" present "without the consent of the American people."  *Id.*, at 1919.  See also *id.*, at 1976 (Sen. Barkley) (discussing "unlawful immigrants" "who have no legal status").  This understanding was shaped not only by the ordinary meaning of the words, but also by legislators' view of the meaning of those words as they appear in the Constitution.

In particular, Senator David A. Reed of Pennsylvania noted his support for the policy of excluding aliens without lawful status, but refrained from voting in favor of a proposal to do just that because he did not believe that the Constitution allowed it.  *Id.*, at 1958.  See also *id.*, at 1821–1822 (reprinting C. Turney, Power Of Congress To Exclude Aliens From Enumeration For Purposes Of Apportionment Of Representatives (April 30, 1929)); 71 Cong. Rec. 2065–2066 (discussing a proposed amendment that would immediately remove aliens from apportionment "upon the ratification of

BREYER, J., dissenting

any amendment to the Constitution excluding aliens"). That same year, two constitutional amendments were introduced in Congress to exclude aliens from the apportionment base. Neither succeeded. See *San Jose*, ___ F. Supp. 3d., at ___, 2020 WL 6253433, *5 (citing Hearing on H. J. Res. 102 and H. J. Res. 351 before the House Committee on the Judiciary, 70th Cong., 2d Sess., 1 (1929)). All told, Congress was well aware of the implications of its chosen language for the precise question we face here.

*Fourth*, the decades following the 1929 Act tell the same story. Just like every census that came before, no census since has excluded people based solely on immigration status. Instead, the census has continued to look to usual residence as the relevant criterion. At numerous points, the Executive Branch has reaffirmed its view that the law simply does not allow for the exclusion of aliens without lawful status who reside in the United States. See, *e.g.*, 135 Cong. Rec. 22521 (1989) (printing Letter from C. Crawford, Assistant Attorney Gen., to Sen. Bingaman (Sept. 22, 1989)); Hearing before the Subcommittee on Energy, Nuclear Proliferation, and Government Processes of the Senate Committee on Governmental Affairs, Enumeration Of Undocumented Aliens In The Decennial Census, 99th Cong., 1st Sess., 19 (1985) ("Traditional understanding of the Constitution and the legal direction provided by the Congress has meant that for every census since the first one in 1790, we have tried to count residents of the country, regardless of their status") (Statement of Census Bureau Director J. Keane); *Federation for Am. Immigration Reform* v. *Klutznick*, 486 F. Supp. 564, 576 (DDC 1980) ("The Census Bureau has always attempted to count every person residing in a State on census day, and the population base for purposes of apportionment has always included all persons, including aliens both lawfully and unlawfully within our borders"). Those in the Legislative Branch have routinely reached the same result. See, *e.g.*, 135 Cong. Rec. 14551

(Statement of Sen. Bumpers); Hearing on S. 2366 before the Subcommittee on Energy, Nuclear Proliferation, and Federal Services of the Senate Committee on Governmental Affairs, 96th Cong., 2d Sess., 12 (1980) (Statement of Sen. Javits); 86 Cong. Rec. 4372 (1940) (Statement of Rep. Celler). While some members may have considered the constitutional question unsettled, all accepted that the governing statutes would have to be changed to exclude undocumented immigrants. See, *e.g.*, 135 Cong. Rec. 14540 (Statement of Sen. Shelby) (proposing an amendment to allow the Census Bureau to depart from its "established policy" and exclude aliens); Hearing on S. 2366, at 1 (discussing a bill that would "require that the numbers be adjusted downward to account for people who are not in this country legally"). The apparently uniform view was that the statute requires the inclusion of all people who usually reside within the United States. See *Franklin*, 505 U. S., at 804. Each branch, interpreting the law for itself, has followed the text and history to the same conclusion.

The 2020 census, in fact, proceeded along this course, at least until the Presidential memorandum. According to the Census Bureau's regulations, the "enumeration procedures" for the 2020 census "are guided by the constitutional and statutory mandates to count all residents of the several states." 83 Fed. Reg. 5525, 5526 (2018). In adopting the Rule, the Census Bureau considered a comment expressing concern over the inclusion of "undocumented people," but adhered to its policy of counting all foreign citizens "if, at the time of the census, they are living and sleeping most of the time at a residence in the United States." *Id.*, at 5530. The Rule goes on to clarify that "*[p]eople in federal detention centers on Census day, such as . . . Immigration and Customs Enforcement (ICE) Service Processing Centers, and ICE contract detention facilities*" will be "counted at the facility." *Id.*, at 5535. That Rule did not suggest that enumeration would turn on immigration status. The novelty of

the interpretation reflected in the memorandum, after nearly 100 years of a contrary and consistent position, is yet another strong indication that the Government's reading of the statute is wrong.  See *Montana* v. *Wyoming*, 563 U. S. 368, 387 (2011).

To summarize: The text of the 1929 Act is concerned with usual residence, not immigration status.  The history, both before and after the legislation, has for decades been in accord with that straightforward interpretation.  And all three branches of Government, when facing the exact question presented in this case, have uniformly arrived at the same result.

B

In the face of this evidence, the Government principally relies on scattered historic sources from the founding era, which it argues imbue the words of the statute with a more restrictive meaning.  The Government's argument relies on two assumptions.  First, the Framers intended for the constitutional language "whole number of free persons" to be read as synonymous with the word "inhabitant," a legal term of art the Government believes excludes those who are in the country in violation of the law.  Second, when Congress carried forward the constitutional text into the 1929 Act, it understood those words to have that narrower meaning.

There are defects in both links of this chain.  First, the argument is not convincing with respect to the widely accepted meaning of the Constitution, either in the founding era or at the time the Fourteenth Amendment was enacted.  In *Franklin*, we understood the term "inhabitant" as comparable to the concept of "usual residency," which, as the analysis above demonstrates, does not turn on immigration status.  505 U. S., at 804–805.  The historical evidence put forward by the Government does not undermine that result.

Many of the Government's sources simply show that the

BREYER, J., dissenting

"usual residence" criterion has been applied to immigrants. See Dept. of Commerce and Labor, Bureau of the Census, Thirteenth Census of the United States: Instructions to Enumerators, April 15, 1910, 21 (1910) (stating that "aliens who have left this country" should not be counted because "nothing definite can be known as to whether such aliens intend to return to this country"); *Bas* v. *Steele*, 2 F. Cas. 988, 993 (CC Pa. 1818) (concluding a foreign trader visiting a port with cargo had not established "domicil[e]" in the United States because "[g]oing to a place to obtain a cargo, and coming away, does not give a [him] a domicil[e], or make him an inhabitant"). Other sources show that immigration laws themselves have taken account of similar criteria for other purposes. See *Department of Homeland Security* v. *Thuraissigiam*, 591 U. S. ___, ___ (2020) (slip op., at 34) (discussing the significance of "'acquir[ing] any domicil[e] or residence within the United States'" for Due Process rights to attach for those not naturalized or otherwise officially admitted to the country (quoting *Nishimura Ekiu* v. *United States*, 142 U. S. 651, 660 (1892))); see also *Kaplan*, 267 U. S., at 230 (asking whether a minor was legally "dwelling" in the United States for purposes of a naturalization statute). These few instances of a court asking whether an immigrant is "domiciled" in the country or has an "intent to return" to the United States do not show that immigration status is somehow a proxy for the concept of residency. To the contrary, they show that these principles can be applied to those lawfully and unlawfully present on the same terms.

The Government's argument for a narrower construction of "inhabitant" turns largely on Vattel's founding-era treatise on the law of nations, which distinguishes between the "inhabitants" and "citizens" of a nation. Brief for United States 36 (citing 1 Vattel, The Law of Nations §213 (1760)). Even assuming that the Government offers the best reading of his work, and that this reading of Vattel informed the

Framers' understanding of that field, his treatise simply cannot bear the weight the Government puts on it. Vattel's work discussed international law, not the United States' scheme for apportionment among the States, an issue not intrinsically related to the law of nations nor one for which founding-era thinkers drew on Vattel. The Apportionment Clause emerged from an extensive and uniquely American debate over both State representation and taxation. The final language tied the two together, such that the burdens of taxation would flow in proportion to the benefits of representation. See Brief for Historians of the Census as *Amici Curiae* 6–11. And however influential Vattel may have been for other topics, the Federal Government did not begin to restrict immigration into the United States until after the Civil War. See Brief for State of California et al. as *Amicus Curiae* 17. While the Government offers isolated works from a different body of law—regarding a word that does not appear in the constitutional text—the better guide to the Constitution's meaning is the specific historical evidence about domestic apportionment, as well as the decades of consistent practice that comports with the Clause's plain terms.

Second, and more importantly for this case, the Framers' intent is not our focus. Instead, the question is the meaning of the statute enacted in 1929. Even if the Government's sources evince some ambiguity over the meaning of the Constitution's census provisions in 1787 or 1868—a doubtful proposition—the historical record had resolved it by the time of the 1929 Act. There is simply no basis for thinking that when Congress enacted the statute that mirrored the constitutional language it was intending to depart so fundamentally from the procedures that had been consistently applied up to that point.

Apart from the historical evidence, the Government offers little more than its assertion that excluding aliens without lawful status makes good policy sense. As the

BREYER, J., dissenting

memorandum reasons, "[e]xcluding . . . illegal aliens from the apportionment base is more consonant with the principles of representative democracy underpinning our system of Government."  85 Fed. Reg. 44680.  Whatever the merits of that policy, it is not the approach to representative democracy that is set forth in the statute.  Congress chose instead a view of democracy wherein the Representatives are apportioned based on "the whole number of persons in each state," not the whole number of voters, citizens, or lawful residents.

The Government is surely correct that the statute provides the President and the Secretary some degree of discretion in carrying out their statutory responsibilities.  The concept of "usual residence" is an indeterminate one, which "has continued to hold broad connotations." *Franklin*, 505 U. S., at 805.  The exercise of that discretion may involve a number of judgment calls.  How long must a person reside in a State before it can be presumed that she intends to remain?  Should prisoners be counted in the State of their incarceration, or the State where they resided prior to, and where they intend to return following, their confinement?  In resolving such issues, the Executive's judgment has consistently been directed toward the meaning of "usual residence."  A policy that draws lines based on immigration status does no such thing.  Most aliens without lawful status have lived exclusively in the United States for many years. See Krogstad, Passel, and Cohn, Pew Research Center, Five Facts About Illegal Immigration in the U. S. (2019).  The Government does not suggest otherwise.  Its own Residency Rule, which treated ICE detainees' residency in the same manner as other federal prisoners, recognizes the lack of any logical relationship between immigration status and residence.  Put simply, discretion to interpret and apply a statutory command is not a blank check to depart from it. That, I fear, is what the Government has tried to do here.

20                          TRUMP *v.* NEW YORK

Thus, the touchstone for counting persons in the decennial census is their usual residence, not their immigration status. That alone is enough to resolve this case, because the memorandum seeks to exclude anywhere between tens of thousands and millions of persons from the census count based solely on their immigration status, and it does so for the stated goal of changing the apportionment total at the expense of the plaintiffs. The Government seems to believe that its policy can stand so long as any alien without lawful status is excludable on some other basis. However reasonable such an ad hoc approach might be in theory, that is not the policy the memorandum announces, nor does it support excluding aliens without lawful status *as a class*. To the extent there is some overlap between aliens without lawful status and persons who would not be counted under the ordinary census procedures, that cannot justify the exclusion of aliens simply on account of their immigration status. It is our task to review the policy as promulgated, and that policy draws a distinction that the statute does not allow.

## III

It is worth considering the costs of the Presidential memorandum's departure from settled law. The modern census emerged from periods of intense political conflict, whereby politicians sought to exploit census procedures to their advantage. See *Evans*, 536 U. S., at 497 (THOMAS, J., concurring in part and dissenting in part); *Montana*, 503 U. S., at 451–452, and n. 25. In enacting the 1929 Act, Congress sought to address that problem by using clear and broad language that would cabin discretion and remove opportunities for political gamesmanship. History shows that, all things considered, that approach has served us fairly well. Departing from the text is an open invitation to use discretion to increase an electoral advantage. This produces the hostility that the 1929 Congress sought to resolve.

Because I believe plaintiffs' claims are justiciable, ripe for

Cite as: 592 U. S. ____ (2020)          21

BREYER, J., dissenting

review, and meritorious, I would affirm the lower court's holding.  I respectfully dissent.